SIERRA CLUB, Arkansas Wildlife Federation, Inc., and Friends of Crater of Diamonds State Park, Inc., Plaintiffs,

v.

Richard DAVIES, Acting Director, Arkansas Department of Parks and Tourism; Arkansas Parks, Recreation and Travel Commission; John Cook, Director, National Park Service, S.W. Region; and Manual Lujan, Secretary, U.S. Department of the Interior, Defendants.

CAPRICORN MINING COMPANY and Kennecot Exploration Company, Intervenors/Third Party Plaintiffs,

v.

SIERRA CLUB, Arkansas Wildlife Federation, Inc. and Friends of Crater of Diamonds State Park, Inc., Third Party Defendants.

No. LR–C–90–56.

United States District Court, E.D. Arkansas, W.D.

Aug. 6, 1990.

James W. Stanley, Jr., North Little Rock, Ark., John P. Gill, Richard Lawrence, Little Rock, Ark., for plaintiffs.

William C. Adair, Asst. U.S. Atty., Jeffrey A. Bell and Stacy Van Ausdall Grundfest, Little Rock, Ark., for defendants.

Byron Freeland, Walter Wright, Jr. and Stuart P. Miller, Little Rock, Ark., for intervenors/third party plaintiffs.

## MEMORANDUM OPINION

SUSAN WEBBER WRIGHT, District Judge.

### I. Facts

Plaintiffs instituted this action to enjoin test drilling and other mining activities in the Crater of Diamonds State Park. The park is located in Murfreesboro, Pike County, Arkansas and contains the only site in North America that is open to the public for mining for diamonds in their natural matrix. It is on the National Register of Historic Places and is listed in the Arkansas Natural Heritage Commission's Registry of Arkansas Natural Areas.

In 1906 the property that is now the state park yielded its first confirmed diamond.[1] Subsequently, the property

changed hands numerous times, and several attempts were made to mine it commercially but none were profitable. In 1952 the site was operated as a tourist attraction under the joint ownership of several of the landowners, and in 1969 a Texas mineral company consolidated ownership of several fragments into one parcel. The State of Arkansas purchased the approximately 887 acres of land in 1972 and dedicated it as Crater of Diamonds State Park.[2]

Since the establishment of the park, numerous inquiries have been made concerning the feasibility of commercial mining in the park. In 1986 Defendant Parks, Recreation and Travel Commission (Commission), which is the policy-making board for the Parks and Tourism Division of the Arkansas Department of Parks and Tourism, determined that an examination should be conducted of the commercial mining potential of the Crater of Diamonds State Park. At the Defendant Commission's request, the Governor appointed a special task force to assess the feasibility and the practicality of commercial mining at the Park. After determining that existing state mining legislation was inappropriate to mining precious minerals, the Task Force recommended legislation to permit the Commission to enter into lease arrangements for commercial exploration and production of diamonds at the Crater of Diamonds State Park. In 1988 the Task Force recommended that testing be conducted to determine the size and shape of the diamond

1. Between January 1985 and December 1987, a total of 438.52 carats of stones have been found and reported. Plaintiffs' Exhibit 22.

2. Public mining activity at the Park takes place on approximately 37 acres of "exposed pipe." The pipe is the geological term for the formation of kimberlite, which is the diamond-bearing formation.

The diamond field itself is the site of an old volcano of the same type as that yielding diamonds in South Africa. An eruption forced the volcanic core of pipe of diamond bearing material up through overlying layers of rock which were topped by pieces of jasper and other durable rocks. These rocks are now found mixed in the breccia that fell back into the crater after the eruption. The upper

portion of the volcano has been destroyed by erosion. The diamond bearing rock occurs in what is commonly called a "pipe," which is the neck or vent of an extinct volcano or Igneous vent filled with the diamond bearing rock. The neck of a volcano is the channel filled with solidified lava by which the molten rock reaches the surface. The vertical extent of the pipe is not known for certain, but its similarity to the south African deposits would suggest it has a similar downward extent. Surrounding the neck are massive quartzites and sandstones, traces of Jacksfork sandstone of carboniferous age being found in the area. Thick beds of a course conglomerate overlie the quartzites and sandstones. These beds were deposited subsequent to the destruction of the volcano.

pipe,[3] and in 1989 the Defendant Commission authorized the Arkansas Department of Parks and Tourism to conduct test drilling, or Phase I testing.[4] The test drilling was contingent upon obtaining the approval of Defendant Secretary of the Interior. Approval was necessary because in 1976 the State of Arkansas sought and received federal funds under the Land and Water Conservation Fund Act (L & WCF) to develop the park's recreational facilities. Under that Act the Secretary must approve any "conversion" of property developed with such funds to some use other than public outdoor recreational uses. 16 U.S.C. § 460*l*–8(f)(3).

A formal proposal was presented to the National Park Service in October 1988.[5] The National Park Service requested additional information from the Arkansas Department of Parks and Tourism in November 1988[6], and the State responded with a more specific proposal in February 1989.[7] In a May 1989 memorandum to the Regional Director, Southwest Region, National Park Service, the Field Solicitor, citing *Friends of the Shawangunks, Inc. v. Clark*, 754 F.2d 446 (2nd Cir.1985), stated his opinion that "the proposed use of the Park for the testing program will be a conversion to other than public outdoor recreation uses."[8] In a letter dated May 24, 1989, the National Park Service disapproved the request for a Phase I testing program at the Park, noting that "said testing could have the potential of progressing into a full-blown commercial diamond mining operation."[9] The following day, an Associate Solicitor in Washington,

D.C. wrote the Field Solicitor of the Southwest Region, surmised that perhaps his conclusion was premature, and urged him to withdraw his opinion.[10] The Field Solicitor withdrew his opinion in June 1989,[11] and in July the National Park Service approved Phase I testing as a temporary nonconforming use.[12]

In their complaint, plaintiffs allege that the decision by Defendants Cook and Lujan to allow Phase I test drilling in the park was arbitrary, capricious, clearly erroneous, and not supported by substantial evidence. They contend that test drilling and commercial mining in the park amounts to a conversion under the Land and Water Conservation Fund Act and that such a conversion requires the preparation of an environmental impact statement. Plaintiffs further allege that Defendant Commission made no independent determination of the reasonableness of Phase I drilling or commercial mining in the park and delegated to Defendants Cook and Lujan decisions that are in the exclusive purview of the Commission. Additionally, plaintiffs allege that Defendant Commission's actions violate a restrictive covenant contained in Ark. Code Ann. § 22–4–107[13] to maintain the park in perpetuity as a recreational facility and therefore violate the public trust. Finally, plaintiffs contend that Act 793 of 1987, codified as Ark.Code Ann. § 22–5–817, is unconstitutional because it impairs the obligation of the contractual agreement between the State and the federal government that the park be utilized for public recreational purposes.

Plaintiffs' Exhibit 7.

**3.** Some diamond-bearing pipes are cone-shaped, some are shaped like a champagne glass, and others are more cylindrical.

**4.** The Phase I testing procedure involves the drilling of no more than 30 holes, approximately 2.890 inches in diameter. The core material extracted from each hole would be about 1⅞ inches in diameter. The holes are to be drilled one at a time and filled before moving on to the next hole. The duration of this activity is to be no longer than 12 weeks.

**5.** Government's Exhibit 2, No. 25.

**6.** Government's Exhibit 2, No. 28.

**7.** Plaintiffs' Exhibit 22.

**8.** Government's Exhibit 2, No. 40.

**9.** Plaintiffs' Exhibit 15.

**10.** Government's Exhibit 2, No. 44.

**11.** Government's Exhibit 2, No. 52.

**12.** Plaintiffs' Exhibit 14. The Court notes that there is no provision for the granting of a temporary non-conforming use in the statute.

**13.** This is not the statutory reference in the plaintiffs' complaint, however, it is the statute the plaintiffs subsequently cite in their briefs.

In response, Defendants Davies and Commission assert that Phase I testing is not a conversion under the L & WCF Act and is not a "major federal action" under the National Environmental Policy Act requiring an environmental impact statement. They deny that there is an agreement between the Commission and the United States, that Ark.Code Ann. § 22–4–107 establishes a restrictive covenant, and that Act 793 is unconstitutional.

Plaintiffs unsuccessfully sought a temporary restraining order to halt Phase I test drilling, and the Court granted the intervenors' motion to intervene. The intervenors are mining companies that invested money to fund the Phase I testing. They counterclaimed against the plaintiffs for damages for the harm caused by the delay and possible prohibition of test drilling and commercial mining at the park. The Court entertained plaintiffs' motion for a preliminary injunction and after a two-day hearing denied the motion, finding that the plaintiffs did not establish a threat of irreparable harm. *See Dataphase Systems v. C.L. Systems,* 640 F.2d 109 (8th Cir.1981). The parties agreed that no further hearings were necessary for a decision on the merits and have filed post-hearing briefs.

## II. *The Land and Water Conservation Fund Act*

■ The plaintiffs allege that the decision of the Secretary to allow Phase I testing was arbitrary, capricious, unreasonable, and not supported by substantial evidence. The defendants and intervenors maintain that this decision was within the discretion of the Secretary under the provisions of the Land and Water Conservation Fund Act, as Phase I testing does not constitute a "conversion" from recreational use under § 6(f)(3) of the Act.

The essence of the difference between the plaintiffs' and the defendants' positions is that the defendants would have the Court look solely to Phase I testing as an independent process, while the plaintiffs' view of Phase I is that it is an initial, but integral, part of a process directed toward commercial mining of the park.

The Secretary of the Interior, through his agents in the National Park Service, recognized Phase I as having independent value for purposes other than commercial mining. It is clear that the National Park Service granted permission for Phase I testing "as a temporary non-conforming use" on grounds of State assurances that Phase I testing would have value for the park interpretative program. The Regional Director of the National Park Service wrote Mr. Davies as follows:

. . . .

Since you have assured us that Phase I testing will have value for your park interpretive program, and because the anticipated impacts of Phase I testing appear to be very short-termed and of limited geographic area, we have approved Phase I testing as a temporary non-conforming use, separate from subsequent testing or mining actions.

. . . .

Any subsequent testing proposals (beyond Phase I) could have impacts inseparable from actual mining of the Crater of Diamonds site. This means that any request for follow-up testing should be made only in the form of an application, but approval of a conversion would require full compliance with section 6(f)(3) of the Land and Water Conservation Fund Act and the National Environmental Policy Act.[14]

However, the only data obtainable from Phase I testing, according to the evidence, including the uncontroverted testimony of Defendant Davies, the Director of the Arkansas Department of Parks and Tourism, is the size and shape of the pipe. No evidence presented at the hearing on the preliminary injunction or in the exhibits admitted into evidence suggests the specific value this information might have to park users other than that they would know the configuration of the pipe and that core samples would be displayed at the

14. Plaintiffs' Exhibit 14.

park's visitor information center.[15] No evidence suggests that Phase I testing would lead to substantial enhancement of the park's recreational value. Phase I would not, according to the evidence presented, reveal information concerning the volume of diamonds or their quality. According to Defendant Davies, only Phase II would provide that data.[16] Therefore, the Court finds that the interpretive data available as a result of Phase I testing would be of little or no beneficial use to recreational users of the park.

The record in this case indicates that the State, in seeking permission for Phase I testing, had commercial mining as its actual goal. The Diamond Mine Advisory Task Force, appointed by the Governor at the request of the Commission, issued its findings and recommendations in October 1988. These findings and recommendations are unequivocally focused on the feasibility and potential of commercial mining at the park, not on the park interpretive program.[17]

The Arkansas General Assembly passed Act 793 of 1987 [18] in response to the recommendation of the Diamond Mine Advisory Task Force Committee. The Act authorizes the Arkansas Parks, Recreation and Travel Commission to lease the Crater of Diamonds State Park for commercial mining. However, the Act does not mention as a legislative goal the obtaining of data for the park interpretive program. Although the interpretive data obtainable from testing is a prerequisite for commercial mining, obtaining such data was not an independent goal of the General Assembly when it passed this legislation.

There are other indicia that the actual purpose of Phase I testing is to determine the feasibility of commercial mining. Mining companies, including the intervenors, are financing 100% of the costs of Phase I testing. A representative of one of these companies testified at the hearing that the interest of his company was commercial mining for profit.

■ The scope of review of an agency decision is a narrow one. *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

> [A] court is not to substitute its judgment for that of the agency.... Normally, an agency rule would be arbitrary and capricious if the agency has ... offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 43, 103 S.Ct. at 2866. *See* 5 U.S.C. § 706.

The Court has reviewed the entire administrative record [19] and the depositions of Edwin L. Shellenberger, Assistant Regional Director for Recreation Programs and Internal Programs in the Southwest Regional Office, National Park Service, and Michael Wilson, Acting Assistant Chief of the Recreation Grants Division of the National Park Service. The Court finds that the overwhelming weight of the evidence indicates the intent of Phase I testing proposed by the State was not to obtain data for the park interpretive program but to obtain information that might ultimately lead to commercial mining. Therefore, the Secretary's decision to permit testing to obtain data for the park interpretive program was arbitrary, capricious and not supported by substantial evidence.

Act 793 of 1987 contemplates devoting areas of the park to commercial mining, a non-recreational use. Such a use is a direct violation of the grant from the federal

---

**15.** Defendants' Exhibit 3 (Submission to the United States Department of the Interior for Geologic Investigation of the Crater of Diamonds State Park by the Arkansas Department of Parks and Tourism), p. 12.

**16.** Defendant Davies' testimony is consistent with the State's "Request for Proposals" (Plaintiffs' Exhibit 1).

**17.** Plaintiffs' Exhibit 23.

**18.** Ark.Code Ann. § 22–5–817 (Supp.1989).

**19.** Government's Exhibit 2.

government under the Land and Water Conservation Fund Act that the park be maintained for public outdoor recreation use or replaced, with the approval of the Secretary, in accordance with the provisions of § 6(f)(3) of the Act. That section provides in part that:

No property acquired or developed with assistance under this section shall, without the approval of the Secretary, be converted to other than public outdoor recreation uses. The Secretary shall approve such conversion only if he finds it to be in accord with the then existing comprehensive statewide outdoor recreation plan and only upon such conditions as he deems necessary to assure the substitution of other recreation properties of at least equal fair market value and of reasonably equivalent usefulness and location.

16 U.S.C. § 460*l*–8(f)(3).

Evidence at the preliminary injunction hearing indicated that the State of Arkansas has an outdoor recreation plan which does not include commercial testing or mining of the Crater of Diamond State Park. There was absolutely no evidence that another diamond mine exists that could be substitution property under the terms of the Act.

In their post-hearing briefs, the defendants note that an amendment to the L & WCF Act provides that wetlands are considered to be of "reasonably equivalent usefulness" regardless of the original use. The amendment provides:

That wetland areas and interests therein as identified in the wetlands provisions of the comprehensive plan and proposed to be acquired as suitable replacement property within that same State that is otherwise acceptable to the Secretary, acting through the Director of the National Park Service, shall be considered to be of reasonably equivalent usefulness

with the property proposed for conversion.

16 U.S.C. § 460*l*–8(f).[20]

There is no evidence that the State of Arkansas has a comprehensive outdoor recreation plan which would provide for suitable wetland property for substitution. Since the Court finds that Phase I testing is calculated to determine the feasibility of commercial mining and is an integral part of the commercial mining process, the Secretary was in error when he failed to categorize this activity as a conversion under the L & WCF Act.

Even if this Court should choose to regard Phase I testing as a separate, distinct activity, this Court would nevertheless construe Phase I testing as a conversion of park property to non-recreational use. This was apparently the view of Mr. Edwin Shellenberger, the Assistant Regional Director for Recreation Programs and External Programs in the Southwest Regional Office, National Park Service, according to a memo summarizing a July 28, 1988, meeting, with state officials.[21] In a later deposition, Mr. Shellenberger indicated that it was a "fair statement" to say that he is the person in the NPS most familiar with the mining proposals at the Crater of Diamonds, because requests for conversions begin at his office.[22]

Initially the National Park Service took this position and rejected Phase I testing. A letter from the Acting Director of the Southwest Region of the National Park Service to Jo Luck Wilson, Director of the Arkansas Department of Parks and Tourism, reads in part:

[T]he United States Court of Appeals for the Second Circuit in [*Friends of the Shawangunks, Inc. v. Clark,* 754 F.2d 446 (2nd Cir.1985)] found that a change in the character of the land or the population having access to it for public recreation purposes constituted a conversion. In that both the testing or any mining of the Crater of Diamonds would result in

---

**20.** This amendment was passed in 1986, after the Crater of Diamonds State Park received the L & WCF grant and developed this park. The Court does not decide whether the amendment could apply to a conversion of this park.

**21.** Plaintiffs' Exhibit 18.

**22.** Government's Exhibit 4, p. 4.

1) a diminution of the area that is accessible to the general public for public outdoor recreation, 2) the conversion of a portion of the area from public outdoor recreation use to non-public commercial/industrial use, and 3) a change in the character of the land, it is clear to us that either of these actions constitutes a violation of Section 6(f)(3) as well as the intent and purpose of the Land and Water Conservation Fund Act of 1965.... [23]

In *Friends of the Shawangunks, Inc. v. Clark, supra,* the court noted that the Land and Water Conservation Act is a conservation act, and "conservation" may include "the protection of a present resource in its natural state." [24] Here, the "natural" state of the diamond mine, when it received the L & WCF grant, was a public park where members of the public could search for diamonds. Phase I testing is an alteration of that "natural" state calculated to benefit private interests at the expense of park recreational uses and therefore constitutes a conversion under § 6(f)(3) of the Act.

### III. The National Environmental Policy Act

The Secretary did not prepare an environmental impact statement (EIS) for Phase I testing. The plaintiffs allege that the Secretary was obligated to do so pursuant to the National Environmental Policy Act.[25] The defendants and the intervenors maintain that no EIS is required in a project such as Phase I testing, that an environmental assessment would suffice under NEPA, and that a document prepared by the State and submitted to the National Park Service was sufficient as an environmental assessment.

This issue centers on whether the Phase I testing may be "segmented" from commercial mining. *See, e.g., Taxpayers Watchdog, Inc. v. Stanley,* 819 F.2d 294 (D.C.Cir.1987). This Court finds it unnecessary to decide this issue at this time. However, the Court notes that there are judicial decisions holding that exploratory mining activities do not so affect the environment as to require an EIS. *E.g., Sierra Club v. Hathaway,* 579 F.2d 1162 (9th Cir. 1978); *Cabinet Mountains Wilderness v. Peterson,* 510 F.Supp. 1186 (D.D.C.1981), *aff'd,* 685 F.2d 678 (D.C.Cir.1982); *Peshlakai v. Duncan,* 476 F.Supp. 1247 (D.D.C. 1979). The Court does not believe that these decisions should be controlling for Phase I testing in the Crater of Diamonds State Park because the very purpose of the park is to permit members of the public to hunt for diamonds, and commercial testing or mining for diamonds invades this purpose directly. The fact that the park is on the National Register of Historic Places only heightens the need for thorough environmental review.

### IV. The Public Trust Doctrine

The plaintiffs allege that the State of Arkansas violated the public trust when it authorized Phase I testing at the Crater of Diamonds State Park. The defendants and intervenors maintain that the public trust doctrine does not apply in this situation. The Arkansas Supreme Court has never addressed the public trust doctrine. There is some indication that the Arkansas General Assembly recognizes a fiduciary duty to the public with respect to state parks. Ark.Code Ann. § 22–4–107 (1987) reads:

(a) All parks acquired by the state shall forever be reserved and maintained by the state for the use and enjoyment of the public.

(b) It shall be the duty of the State Parks, Recreation, and Travel Commission to preserve the parks in their natural condition so far as may be consistent with their use and safety and to improve them in such manner as not to lessen their natural, scenic, historic, and wildlife values.

This Court finds it unnecessary to determine whether Phase I testing or commercial mining would be in violation of state law because of the finding that Phase I

---

**23.** Plaintiffs' Exhibit 15.

**24.** 754 F.2d at 450.

**25.** 42 U.S.C. § 4321 *et seq.*

testing violates the provisions of the Land and Water Conservation Fund Act.

However, the Court is of the opinion that if Phase I testing leads to commercial mining of the park through a mineral lease to private parties, the State would be selling park property. The Arkansas Supreme Court has consistently held that a mineral lease in Arkansas constitutes a sale of an interest in property. Some Arkansas decisions on this issue characterize the mineral lease as an easement, *e.g., Garvan v. Kimsey*, 239 Ark. 295, 297, 389 S.W.2d 870 (1965), *Pasteur v. Niswanger*, 226 Ark. 486, 488, 290 S.W.2d 852, 853 (1956), while the most recent decision addressing the question characterized a mineral lease as a present sale of the minerals in place, *Hillard v. Stephens*, 276 Ark. 545, 550, 637 S.W.2d 581, 583 (1982).

Even though Arkansas law has not directly addressed the public trust doctrine, it has addressed in some respects the sale of park property and the sale of property acquired by eminent domain. The Arkansas General Assembly has provided for the sale or exchange of state park lands which the commission finds are "unsuited for state park purposes." Ark.Code Ann. § 22–4–108 (1987). This statute also provides that the Governor must approve the sale or exchange, and that the proceeds of a sale must be invested in other lands suitable for park purposes.

Parts of the park were acquired by the State from private owners through eminent domain. The Arkansas Supreme Court has held that private property may be taken for public use, but "public use" means use by the public, not use by private parties, even if the public benefits. In *City of Little Rock v. Raines*, 241 Ark. 1071, 411 S.W.2d 486 (1967), the Arkansas Supreme Court held that the sale of land obtained through eminent domain to private interests for industrial uses is not valid. In that decision Justice Fogleman wrote for the court:

> Private property can be taken under the power of eminent domain only for a public use. For a use to be public it is necessary that the public shall be concerned in the use to be made thereof and

the purpose for which the property is to be used must in fact be a public one. 241 Ark. at 1083, 411 S.W.2d at 493.

■ In *Raines* the issue was the validity of a condemnation proceeding itself. The court did not address the question of what a governmental entity might do with property it condemned once its public use had terminated. However, other decisions of the Arkansas Supreme Court clearly indicate that property obtained from private owners through eminent domain does not revert to the prior owners when the government abandons its use of the property, *e.g. Arkansas State Highway Commission v. Marshall*, 253 Ark. 212, 485 S.W.2d 740 (1972), or otherwise lawfully discontinues the use. *See, e.g., Marsh v. City of Hot Springs*, 241 Ark. 159, 406 S.W.2d 714 (1966).

Clearly these lands are not now unsuited for state park purposes since they are presently being used by the public. Nor has the State of Arkansas abandoned the use of the Crater of Diamonds property as a park since it remains open to tourists during Phase I testing. Whether a commercial lease of the Crater of Diamonds State Park would violate the principles of *Raines* or would be a lawful termination of a public use is a difficult question of state law which this Court need not answer.

## V. Conclusion

The Court concludes that the decision of the Secretary of the Interior to approve Phase I test drilling was arbitrary, capricious, not supported by substantial evidence, and is contrary to the Land and Water Conservation Fund Act. Therefore, the Court does not reach the merits of the plaintiffs' other allegations.

■ In their counterclaim the intervenors sought damages for any harm they might suffer by the delay and possible prohibition of test drilling and commercial mining at the Park. The Court finds that the intervenors entered into the contract knowing of the risks involved and proceeded with their test drilling despite this Court's notice that it believed, based on the

evidence submitted during the preliminary injunction hearing, that the plaintiffs would prevail on the merits. The counterclaim of the intervenors is dismissed.

For the reasons stated, judgment is rendered for the plaintiffs. The Court hereby permanently enjoins the defendants and intervenors from further Phase I testing activity or any related testing or mining activity at the Crater of Diamonds State Park. The Court retains jurisdiction of this matter to enforce this order and for such other matters as may come before the Court.

SO ORDERED.