955 F.2d 1188
 SIERRA CLUB; Arkansas Wildlife Federation, Inc.; and
Friends of Crater of Diamonds, State Park, Inc., Appellees,
v.
Richard DAVIES, Acting Director of Arkansas Parks and
Tourism; Arkansas Parks Recreation & Travel Commission;
John Cook, Director, National Park Service, S.W. Region;
Manual Lujan, Secretary, U.S. Department of the Interior.
CAPRICORN DIAMONDS, LTD.; and Kennecott Corporation,
(Intervenors/Third Party) Appellants,
v.
SIERRA CLUB; Arkansas Wildlife Federation, Inc.; Friends
of Crater of Diamonds, State Park, Inc., Appellees.
SIERRA CLUB; Arkansas Wildlife Federation, Inc.; and
Friends of Crater of Diamonds State Park, Inc., Appellees,
v.
Richard DAVIES, Acting Director of Arkansas Parks and
Tourism; Arkansas Parks Recreation & Travel Commission,
John Cook, Director, National Park Service, S.W. Region;
Department of Interior, Manual Lujan, Secretary,
Appellants.
CAPRICORN DIAMONDS, LTD.; Kennecott Corporation, Intervenors Below,
v.
SIERRA CLUB; Arkansas Wildlife Federation, Inc.; Friends
of Crater of Diamonds State Park, Inc., Appellees.
 Nos. 90-2639, 90-2696.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Aug. 26, 1991.
Decided Feb. 5, 1992.
 
 Byron Freeland, Little Rock, Ark., argued for appellants, Kennecott Corp. and Capricorn Diamonds.
 Jacques Gelin, Washington, D.C., argued for appellant, Dept. of Interior.
 Walter Wright and Stuart Miller, Little Rock, Ark., on the brief for appellants.
 James Stanley, North Little Rock, Ark., argued (Richard Lawrence, on the brief), for appellees.
 Before McMILLIAN, WOLLMAN and MAGILL, Circuit Judges.
 MAGILL, Circuit Judge.
 
 
 1
 This appeal concerns whether preliminary testing in a state park aimed at determining the feasibility of commercial diamond mining constitutes a conversion under the federal Land and Water Conservation Fund Act of 1965. The district court concluded that the initial testing was inextricably intertwined with mining and therefore constituted a nonrecreational use under the Act. Since we believe preliminary testing is distinct from the issue of whether commercial mining would constitute a conversion, we reverse in part. We affirm that portion of the district court decision denying damages to appellant mining companies.
 
 I. Factual Background
 
 2
 Although he did not realize it at the time, John W. Huddleston opened this confrontation on August 1, 1906, when he unearthed a diamond on his property south of Murfreesboro in Pike County, Arkansas. Despite the diligence of successive owners, however, no one has profitably mined Huddleston's field.[1] By 1952, the various owners of Huddleston's land and the neighboring fields had turned the "Crater" into a tourist attraction. The land was consolidated into a single parcel in 1969 and the State of Arkansas purchased the 887.3 acres in 1972, dedicating the field as Crater of Diamonds State Park. The park contains a thirty-seven-acre, exposed, diamond-bearing, volcanic pipe, which represents the only site in North America where the public is invited to roll up its sleeves and hunt for diamonds.[2]
 
 
 3
 Despite the mine's recent tranquility, however, intrigue into the commercial mining potential of the land never completely dissipated. The most recent attempt to study the viability of commercial mining surfaced in 1986, when a task force created at the behest of the Arkansas Parks, Recreation and Travel Commission recommended an exploration of mining potential at the reserve.
 
 
 4
 The task force specifically recommended legislation permitting the Commission to enter contracts for the commercial exploration of diamonds at the Crater of Diamonds State Park. The Arkansas Legislature in 1987 authorized the Department of Parks and Tourism to execute a lease for the exploration and production of diamonds at the park. Ark.Code Ann. § 22-5-817 (Michie Supp.1991).
 
 
 5
 Armed with legislation, the task force continued to study the issue, but concluded that it lacked sufficient verified information relating to the size and value of the preserve to make valid judgments as to the park's mining potential. It therefore recommended that the state undertake Phase I investigatory drilling of the reserve.
 
 
 6
 Federal law became implicated in the decision to explore commercial mining because in 1976 Arkansas received a federal matching grant from the National Park Service for $723,808. The grant--part of an acquisition and development project at the Crater of Diamonds State Park--was made through the Land and Water Conservation Fund Act (L & WCFA), 16 U.S.C. §§ 460l-4 to 460l-11 (1988). The Act requires all states that receive grants to maintain the benefited land as public outdoor recreational space forever. Id. at § 460l-8(f)(3). Any conversion of park land to nonrecreational use must be approved by the Secretary of Interior and can come only after the Secretary: (1) finds the conversion in accord with the existing comprehensive statewide outdoor recreation plan, and (2) is assured that the state will substitute other recreational properties of at least equal fair market value and of reasonably equivalent usefulness and location.[3] Id.
 
 
 7
 In light of L & WCFA restrictions, Arkansas sought an opinion from the regional office of the National Park Service as to whether Phase I testing would constitute a conversion.[4] Phase I testing would consist of drilling twenty-five to thirty holes--with each core measuring 1 and 7/8 inches in diameter--to a maximum depth of 1,000 feet. Each hole that is drilled would be refilled before researchers move on to the next hole. The drilling process would require fencing off a fifty by one hundred foot section in the public digging area for a period of not more than twelve weeks. After the test drilling is complete, the park area would be returned to its normal state.
 
 
 8
 On May 24, 1989, the acting regional director of the National Park Service rejected the Phase I testing, concluding it would convert a portion of the area from public outdoor use to nonpublic commercial use. The acting regional director said the testing "could have the potential of progressing into a full-blown commercial diamond mining operation."[5]
 
 
 9
 The following day--May 25, 1989--the Interior Department urged its regional field solicitor to withdraw a legal opinion on which the decision to reject Phase I testing was partially based. The Interior Department letter stated that the Park Service's rejection was premature since the state sought only to make limited tests to determine the feasibility of commercial mining. Even though commercial mining "would certainly constitute a conversion under the Act," it was possible that commercial mining may never take place at the park.[6] After the Interior Department's regional field solicitor withdrew the legal opinion, the Park Service's acting regional director on July 18, 1989, reconsidered the initial decision and approved Phase I testing.
 
 
 10
 Appellees filed suit in January of 1990 to stop the testing and mining.[7] After the mining companies were allowed to intervene, the district court rejected a motion to enjoin the testing. Although the court found that appellees had shown a substantial likelihood of success on the merits, the court ruled that irreparable harm would not result from Phase I testing. Testing began on July 8 and continued until August 6, when the district court permanently enjoined Phase I testing. The mining companies appeal this judgment.
 
 II. Discussion
 
 11
 The heart of the L & WCFA is found in § 6(f)(3). The rather straightforward section provides:
 
 
 12
 No property acquired or developed with assistance under this section shall, without the approval of the Secretary, be converted to other than public outdoor recreation uses. The Secretary shall approve such conversion only if he finds it to be in accord with the then existing comprehensive statewide outdoor recreation plan and only upon such conditions as he deems necessary to assure the substitution of other recreation properties of at least equal fair market value and of reasonably equivalent usefulness and location.
 
 
 13
 16 U.S.C. § 460l-8(f)(3). Appellees argue that Phase I testing constitutes just such a conversion under the Act. The acting regional director determined that Phase I testing would not constitute a conversion, but would be permitted as a "temporary non-conforming use." The agency's decision was emphatically limited to Phase I testing. Contrary to assertions by appellees and the determination of the district court, the agency's decision in no way ushers in a parade of horribles culminating in full-blown commercial mining. The director's letter explicitly stated that approval was made "separate from subsequent testing or mining actions." The director went on: "This approval in no way commits the Federal government to making a similar finding for any testing beyond Phase I. Any future proposal will require rigorous review and analysis." Moreover, the director stated that any subsequent testing proposals would have impact inseparable from actual mining and would, therefore, have to comply with the procedural substitution requirements of § 6(f)(3), as well as the National Environmental Policy Act. 42 U.S.C. §§ 4321 to 4347.[8]
 
 
 14
 It is difficult to hypothesize a statement by the director that would more clearly state that his decision rested entirely on the limited Phase I testing and did not contemplate or permit any subsequent testing or mining activity. Appellees contend, nonetheless, that the state's elaborate planning as well as the funding by the mining companies indicates that Phase I testing is just a precursor to the inevitable commercial mining of the park. Even if the link in planning between Phase I testing and mining is shown to be ironclad, and even if it is shown that commercial mining would constitute a conversion, our review is limited to the agency action. No matter what the evidence shows might happen in the future, it is beyond this court's power to render a speculative decision on postulated facts. It is possible that testing will reveal the potential for commercial mining at the park. If this occurs, it is possible that the elected representatives of the people of Arkansas will decide to mine the park commercially. If they do, they will need to comply with § 6(f)(3) and the National Environmental Policy Act. 42 U.S.C. §§ 4321 to 4347. The agency's approval, if granted, will be reviewable at that point.
 
 
 15
 While the parties dispute the standard of review in this case, there is no real doubt that this appeal, as well as the district court's opinion, are a review of an administrative action. The L & WCFA authorizes the Secretary to review any state modification proposals to determine if the proposed action would constitute a conversion. 16 U.S.C. § 460l-8(f)(3).[9] The district court ruled that the Secretary's decision was arbitrary and capricious.[10] In this appeal of the district court action, we review the Secretary's decision de novo. Our task is to determine whether the Secretary's decision to permit limited Phase I testing without declaring it a conversion was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (1988).
 
 
 16
 In reviewing the district court decision, the appellate court must make an independent decision based on the same administrative record that was before the factfinder. Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam); Moore v. Custis, 736 F.2d 1260, 1262 (8th Cir.1984). The district court opinion, therefore, is afforded no deference. First Nat'l Bank of Fayetteville v. Smith, 508 F.2d 1371, 1374 (8th Cir.1974), cert. denied, 421 U.S. 930, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975).
 
 
 17
 To determine whether an agency's decision was arbitrary and capricious, the reviewing court must determine whether the decision was based on the relevant factors and whether there has been a clear error of judgment. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). While the court's inquiry into the facts must be exhaustive, the ultimate standard of review is a narrow one. The court is not permitted to substitute its judgment for that of the agency. Id.; Moore, 736 F.2d at 1262.
 
 
 18
 When a court reviews an agency's construction of a statute the agency has been entrusted to administer, the court's analysis is two-fold. If Congress has spoken to the precise question at issue, the analysis is complete. This court, as well as the agency, must give effect to the unambiguously expressed intent of Congress (Chevron Prong I). Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). But where, as here, the court determines that Congress has not spoken directly to the issue, the court may not impose its own construction of the statute. Rather, the court's analysis is limited to whether the agency's construction of the statute was permissible. Id. Since the agency was vested with policy-making power, it is authorized to fill in the gaps that may have been left by Congress and this court cannot substitute its judgment for that of the agency, id. at 844, 104 S.Ct. at 2782; Schwartz v. Gordon, 761 F.2d 864, 868 (2d Cir.1985), unless the court finds the agency's construction inconsistent with the statutory mandate or that it frustrates the purpose of Congress (Chevron Prong II). FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981).
 
 
 19
 The L & WCFA does not define conversion. The question turns, then, on whether the agency's[11] determination that Phase I testing would not constitute a conversion was a reasonable construction of the Act. See Chevron U.S.A., 467 U.S. at 842-43, 104 S.Ct. at 2781. The agency has determined that conversions generally occur in four situations:
 
 
 20
 (1) Property interests are conveyed for nonpublic outdoor recreation uses.
 
 
 21
 (2) Nonrecreation uses (public or private) are made of the project area, or a portion thereof.
 
 
 22
 (3) Noneligible indoor recreation facilities are developed within the project area without (National Park Service) approval.
 
 
 23
 (4) Public outdoor recreation use of property acquired or developed with L & WCFA assistance is terminated.
 
 
 24
 L & WCFA Grants Manual, Chapter 675.9.3(A).
 
 
 25
 The only one of these situations possibly pertinent here is the situation where a nonrecreational use is made of a project area. If Phase I testing constituted a nonrecreational "use," it plausibly could constitute a conversion. But under Phase I testing, there is "use" of the park land only in the strictest sense. The park's purpose is by no means turned nonrecreational. The exploratory drilling does not limit public use of the park, except for the ten-to twelve-week period when a 5,000 square foot region will be cordoned off. No permanent damage will come to the land and the available supply of minerals available to public visitors will not be depleted. An interpretation of the regulations holding such activity a nonrecreational "use" would render virtually any temporary, de minimis, nondestructive activity a conversion.
 
 
 26
 The agency certainly does not read its own regulations so broadly. The record is replete with instances in which the agency has construed temporary, nondestructive activities as being other than conversions. The agency specifically exempts from the definition of conversion underground utility easements which do not have a significant impact on the recreational utility of the park. L & WCFA Grants Manual, Chapter 675.9.3(A)(5)(a). The administrative record also reveals an interpretation by the Director of the Bureau of Outdoor Recreation that the construction by a nonowner of a waterline, pipeline, underground utility or "similar construction" which does not impair the present or future recreational use of the property might not constitute a conversion if the surface area is restored to its "preconstruction condition" and there is no relinquishment of control over the property.[12] The agency also has concluded that the sale of subsurface rights or the nondestructive extraction of oil and gas from Land and Water Conservation Fund-assisted land does not constitute a conversion under the Act. L & WCFA Grants Manual, Chapter 675.1(E).
 
 
 27
 The agency clearly has determined that the statute requires more than de minimis and temporary intrusions on small portions of fund-assisted land to constitute a conversion. Viewed in light of the reasonableness of the agency regulations and policies found in the administrative record, the acting regional director's determination that Phase I testing would not constitute a conversion clearly was a permissible construction of the statute, and therefore was not arbitrary and capricious.
 
 
 28
 This construction by the agency reflects the common-sense determination that the agency's discretion--while not boundless--must be exercised in certain cases in order that the flexibility necessary to maintain, improve, and study L & WCFA land is not replaced with a grid of arbitrary distinctions. This need for flexibility is shown by the agency's response to a query seeking the agency's policy under the L & WCFA for dealing with underground utility or irrigation line crossings. The agency concluded that the possible impacts of underground construction on various types of recreation areas were so diverse that no ironclad policy could be created. Rather, the potential problems must be addressed case by case.[13]
 
 
 29
 Finally, the agency's need for flexibility in determining whether nondestructive testing is a conversion is also dictated by the requirements of § 6(f)(3) itself. In order to convert a fund-assisted parcel to another purpose--such as commercial mining--the Secretary must first be assured the state will substitute land of equivalent values and usefulness. 16 U.S.C. § 460l-8(f)(3). But the Secretary must know the value of the converted parcel first. A requirement that the Secretary must first be assured of substituted lands, and then begin testing to determine the value of the converted land, is unworkable. It would require the Secretary to create a new park of reasonably equivalent usefulness and value even before he decides whether or not to convert the state park to a commercial diamond mine and even before he knows the value of the park he is charged to create. Further, it would virtually preclude states from considering whether to convert fund-assisted land to other recreational uses. Since the states would be forced to provide substituted land even before testing to determine which use of the subject land would be most beneficial, states would be discouraged from ever pursuing even beneficial changes. This outcome contravenes the Act. The L & WCFA does not forbid conversions, it merely dictates that the state must replace the converted land with a suitable substitute. Clearly, an agency construction of the statute that enables the state to make nondestructive tests on fund-assisted land to determine its commercial value or potential for other recreational purposes cannot be deemed unreasonable.
 
 
 30
 This interpretation is also well within the confines of the only circuit court case to address the definition of conversion. In Friends of Shawangunks, Inc. v. Clark, 754 F.2d 446, 449 (2d Cir.1985), the Second Circuit ruled that the Park Service's interpretation of what constitutes a conversion must be given considerable deference. Nevertheless, the court overturned an agency determination that transforming a portion of land covered by a conservation easement funded by the L & WCFA into a limited-access, resort golf course did not constitute a conversion. Id. The court specifically found that the proposed development would directly contravene the agency's own regulations. By allowing the development, the agency would enable the holder of fee title to the land on which the easement rested to do precisely what the easement had precluded: change the character of the land from a conservation area for public enjoyment to a private golf course. Id. at 451. Unlike the virtual transfer of title in Shawangunks, no change in the character of the land at Crater of Diamonds State Park would take place. The only effect on park land would be a temporary disruption on approximately 5,000 square feet in the public access area.
 
 
 31
 In light of all the information contained in the record, we find it a permissible construction of the L & WCFA to conclude that temporary, nondestructive testing conducted within the confines of the Phase I proposal does not constitute a conversion. As the agency pointed out, however, any further testing would be inextricably woven with commercial mining and, therefore, would have to comply not only with § 6(f)(3) but with the National Environmental Policy Act. 42 U.S.C. §§ 4321 to 4347 (1988).
 
 
 32
 For the foregoing reasons, we reverse the permanent injunction issued by the district court. We affirm the denial of damages because we find that appellant mining companies entered into the contract for Phase I testing fully aware of the attendant risks of disapproval.
 
 
 33
 McMILLIAN, Circuit Judge, concurring in part and dissenting in part.
 
 
 34
 I concur with the majority opinion to the extent it affirms the denial of damages for appellant mining companies. As to the decision to reverse the permanent injunction, I respectfully dissent. I would affirm the judgment of the district court granting the permanent injunction on grounds that the Secretary's actions were arbitrary, capricious and not in accordance with law because the Secretary lacks authority to excuse the State of Arkansas from complying with the statutory conversion requirements by characterizing the proposed Phase I test drilling as a "temporary non-conforming use."
 
 I.
 
 35
 The majority opinion states "[t]he acting regional director did not articulate the basis for his decision that the Phase I testing was permissible as a temporary nonconforming use and, therefore, not a conversion under the L & WCFA." At 1193 n. 11. Based on this premise, the majority opinion defines the issue as "whether the agency's determination that Phase I testing would not constitute a conversion was a reasonable construction of the Act." At 1193. I disagree with the statement that the acting regional director, the Secretary's delegate, did not articulate the basis for his decision. The acting regional director approved the Phase I test drilling by letter dated July 18, 1989.[1] In that letter, he specifically stated two bases for his decision as follows:
 
 
 36
 Since you have assured us that Phase I testing will have value for your park interpretive program, and because the anticipated impacts of Phase I testing appear to be very short-termed and of limited geographic area, we have approved Phase I testing as a temporary non-conforming use, separate from subsequent testing or mining actions. This approval in no way commits the Federal government to making a similar finding for any testing beyond Phase I. Any future proposal will require rigorous review and analysis. Both of these determinations are contingent upon the accuracy of the estimate of the time needed for Phase I testing included in your proposal (8-9 weeks). A temporary, non-conforming use is approved for 10-12 weeks.
 
 
 37
 * * * * * *
 
 
 38
 ... [I]f the state can commit to a limited duration of 10-12 weeks, the [National Park] Service will approve implementation of the Phase I Testing Program as a temporary non-conforming use.
 
 
 39
 As acknowledged by the majority opinion, judicial review of an agency action, pursuant to 5 U.S.C. § 706(2)(A), begins with the analysis set forth in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (Overton Park ). In Overton Park, the Supreme Court explained that the reviewing court must first decide whether the agency acted within the scope of its authority. Id. at 415, 91 S.Ct. at 823. If the action is within the agency's scope of authority, then the reviewing court is to decide whether the specific action was nonetheless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; at this stage, the reviewing court may not substitute its judgment for that of the agency. Id. at 416, 91 S.Ct. at 823. The final inquiry, if necessary, concerns whether the agency followed the necessary procedural requirements in rendering its decision. Id. at 417, 91 S.Ct. at 824.
 
 
 40
 The agency action under review in this case is the Secretary's[2] approval of the Phase I test drilling, as set forth in the letter of July 18, 1989, from the acting regional director to the State. For the following reasons, I believe that neither the State's assurance that the test drilling will have value to the park's interpretive program, nor the geographic and time limitations of the proposed non-conforming use, is an allowable basis for the Secretary to authorize a non-conforming use of the park such that the State is excused from L & WCFA post-completion compliance responsibilities.
 
 
 41
 The Secretary determined, and no one can realistically dispute, that the proposed Phase I test drilling is "non-conforming" in nature--in other words, not for public outdoor recreation. The question then becomes whether there is any authority for the Secretary to approve the Phase I test drilling merely because it may have some positive spinoff application for the recreational purposes of the park (i.e., it "will have value for [the] park interpretive program"). Nothing in the language or history of § 6(f)(3) of the L & WCFA (codified at 16 U.S.C. § 460l-8(f)(3)), or the applicable regulations, 36 C.F.R. § 59.1-59.4 (1990), provides such authority. Nor does the L & WCF Grants Manual. To the contrary, the statute clearly states that
 
 
 42
 [n]o property acquired or developed with assistance under this section shall, without the approval of the Secretary, be converted to other than public outdoor recreation uses. The Secretary shall approve such conversion only if he finds it to be in accord with the then existing comprehensive statewide outdoor recreation plan and only upon such conditions as he deems necessary to assure the substitution of other recreation properties of at least equal fair market value and of reasonably equivalent usefulness and location.
 
 
 43
 16 U.S.C. § 460l-8(f)(3) (emphasis added). Thus, in my opinion, the Secretary lacks authority to permit the Phase I test drilling on grounds that it would have value for the park interpretive program.
 
 
 44
 Nor do I believe the Secretary has authority to approve the Phase I test drilling upon a determination that "the anticipated impacts of Phase I testing appear to be very short-termed and of limited geographic area." First, the fact that the test drilling would cover a limited geographic area is not grounds for exemption from the L & WCFA conversion requirements. The L & WCF Grants Manual, as discussed in the majority opinion (at 1193), specifically recognizes that a conversion generally occurs when "[n]onrecreation uses (public or private) are made of the project area, or a portion thereof." L & WCF Grants Manual, Chapter 675.9.3.A(2) (emphasis added). Moreover, the Department of the Interior's own regulations require compliance with the statutory conversion requirements when a portion of an L & WCF-assisted area is affected; in contemplation of this possibility, the regulations state "[i]n the case of assisted sites which are partially rather than wholly converted, the impact of the converted portion on the remainder shall be considered." 36 C.F.R. § 59.3(b)(5) (emphasis added). Even more to the point, the agency comment provided upon promulgation of the final rule states "a conversion of use occurs when an assisted site is wholly or in part converted to other than public recreation use." 51 Fed.Reg. 34180 (Sept. 25, 1986) (emphasis added).
 
 
 45
 Second, the fact that the test drilling would be temporary is not grounds for exemption from the L & WCFA conversion requirements. The Secretary specifically stated his position that the limited duration of the proposed Phase I test drilling was critical to his approval, despite the absence of anything in the statute, regulations or Grants Manual which suggests that Congress ever intended to carve out an exception for non-conforming uses of limited duration. To the contrary, § 6(f)(3) states unqualifiedly that an L & WCF assisted property shall not be converted to non-conforming use unless the statutory conversion requirements are satisfied. Moreover, the Department of the Interior's own regulations provide that
 
 
 46
 [s]ection 6(f)(3) of the L & WCF Act is the cornerstone of Federal compliance efforts to ensure that the Federal investments in L & WCF assistance are being maintained in public outdoor recreation use. This section of the Act assures that once an area has been funded with L & WCF assistance, it is continually maintained in public recreation use unless [the National Park Service] approves substitution property of reasonably equivalent usefulness and location and of at least equal fair market value.
 
 
 47
 36 C.F.R. § 59.3(a) (emphasis added).
 
 
 48
 Had Congress intended to exempt temporary non-conforming uses from the usual statutory requirements, the enabling statute would have said so. Were the Secretary nonetheless to interpret the statute so as to allow such temporary non-conforming uses, regulations to that effect should have been promulgated through proper rulemaking procedures. Instead, the applicable regulations, by which the Secretary is bound, speak specifically of assuring that L & WCF-assisted areas be continually maintained in recreational use. Therefore, the Secretary lacks authority to excuse a state from complying with L & WCFA conversion requirements by characterizing a proposed activity as a "temporary non-conforming use."
 
 
 49
 Notwithstanding the agency's own characterization of the Phase I test drilling as a "temporary non-conforming use," the majority opinion suggests that the proposed test drilling does not constitute a "use" of the park within the meaning of § 6(f)(3) on grounds that "[t]he park's purpose is by no means turned nonrecreational." At 1193. I find no basis in the statute or regulations for the proposition that a "use" must rise to the level of changing the purpose of the park in order to constitute a conversion.
 
 
 50
 The majority opinion also states that the Phase I test drilling is permitted because it is a "de minimis" activity. The majority opinion states "[t]he agency clearly has determined that the statute requires more than de minimis and temporary intrusions on small portions of fund-assisted land to constitute a conversion." At 1193-94 (emphasis added). There is no apparent authority for exempting "de minimis" uses from the statutory conversion requirements. Moreover, the acting regional director's letter approving the Phase I test drilling says nothing about whether fencing off 5,000 square feet in the public digging area, for three months, to allow a drill rig to bore twenty-five to thirty holes to a maximum depth of 1,000 feet, is a "de minimis" use. Therefore, were I to agree with this approach, I would require at a minimum that any exemption for a so-called "de minimis" use be based upon rules promulgated by the agency setting forth the standards of such an exemption and findings by the agency that those standards have been met. In the absence of such rules or agency findings, I believe the district court's judgment should be affirmed.
 
 II.
 
 51
 I also agree with the district court's application of Friends of the Shawangunks, Inc. v. Clark, 754 F.2d 446 (2d Cir.1985) (Friends of the Shawangunks ), to the case at bar. Sierra Club v. Davies, 743 F.Supp. 1334, 1339-40 (E.D.Ark.1990). As the majority opinion notes, Friends of the Shawangunks is the only circuit court decision addressing the definition of "conversion," as used in § 6(f)(3). Significantly, Friends of the Shawangunks was also the only such case in existence when the Department of the Interior promulgated its regulations under § 6(f)(3) (36 C.F.R. Part 59) and when Congress amended § 6(f)(3), both of which occurred in 1986. Based upon the reasoning and holding of Friends of the Shawangunks, the district court concluded that the Phase I test drilling, in and of itself, would constitute a conversion under § 6(f)(3) of the L & WCFA. 743 F.Supp. at 1339.[3]
 
 
 52
 Friends of the Shawangunks stated the obvious--that the L & WCF Act "is after all a 'conservation' fund act." 754 F.2d at 450. As explained by the district court, the Second Circuit noted that "conservation" may include "the protection of a present resource in its natural state." Sierra Club v. Davies, 743 F.Supp. at 1340 (citing Friends of the Shawangunks, 754 F.2d at 450). The district court reasoned "the 'natural' state of the diamond mine, when it received the L & WCF grant, was a public park where members of the public could search for diamonds." 743 F.Supp. at 1340. Thus, the district court held "Phase I testing is an alteration of that 'natural' state calculated to benefit private interests at the expense of park recreational uses and therefore constitutes a conversion under § 6(f)(3)." Id. I agree.
 
 
 53
 The Secretary also relied on Friends of the Shawangunks in making his initial determination that the Phase I test drilling would constitute a conversion within the meaning of § 6(f)(3). On review, the district court found compelling, as do I, the Secretary's articulation of that original decision and the reasons behind it. That decision was set forth in a letter, dated May 24, 1989, from the acting regional director to the State. That letter states in pertinent part:
 
 
 54
 Because this proposal is complex and involves a considerable amount of public controversy, we sent the information you submitted to us to both the Environmental Compliance Division and the Office of the Solicitor. Their input has been incorporated into this determination.
 
 
 55
 Approval of your request would amount to the granting of permission for a temporary non-recreation use of the site, based upon a finding that such use would not constitute a conversion as defined by Section 6(f)(3) of the Land and Water Conservation Fund (L & WCF) Act.
 
 
 56
 * * * * * *
 
 
 57
 Throughout the life of the [L & WCF] Program, numerous policy and legal opinions have been written pertaining to Section 6(f)(3), the cornerstone of Federal compliance efforts to ensure that the Federal investments are being maintained in public outdoor recreation use. These interpretations have consistently maintained that once an area has been funded with L & WCF assistance, it is required to remain in public outdoor recreation use in perpetuity or replaced in accordance with the provisions set forth in Section 6(f)(3) of the Act. Furthermore, the United States Court of Appeals for the Second Circuit in Friends of the Shawangunks, Inc. et al. v. Secretary [Clark], U.S. Department of the Interior, et al., 754 F.2d 446 (2d Cir.1985), found that a change in the character of the land or the population having access to it for public recreation purposes constituted a conversion. In that both the testing or any mining of the Crater of Diamonds would result in 1) a diminution of the area that is accessible to the general public for public outdoor recreation, 2) the conversion of a portion of the area from public outdoor recreation use to non-public commercial/industrial use, and 3) a change in the character of the land, it is clear to us that either of these actions constitutes a violation of Section 6(f)(3) as well as the intent and purposes of the Land and Water Conservation Fund Act of 1965, as amended. Therefore, we cannot approve your request.[4]
 
 
 58
 This original agency decision was, in my opinion, legally sound. It certainly was not based upon "arbitrary distinctions," as suggested by the majority opinion. At 1194.[5]
 
 
 59
 For the foregoing reasons, I would affirm the judgment of the district court in full.
 
 
 
 [1]
 The land has been commercially mined intermittently since 1906. Huddleston sold the property to the Arkansas Diamond Company, which opened the "Arkansas Mine" in 1908. From 1912 to 1919, the plant was idled by World War I, but it reorganized in 1919 as the Arkansas Diamond Corporation of Virginia. Shareholders foreclosed on the property in 1927 and backed small-scale mining operations until 1931, when the world diamond market was weakened by the stock market crash and the Depression. The North American Diamond Corporation assumed control of the property in 1941 but, beset by controversial and conflicting geological reports about the reserve's potential, did not begin mining it until 1948
 
 
 [2]
 The site was placed on the National Register of Historic Places in 1973 and is listed in the Arkansas Natural Heritage Commission's Registry of Arkansas Natural Areas
 
 
 [3]
 Since the public diamond mining at Crater of Diamonds State Park is unique, it would be nearly impossible to find equivalently useful land to substitute if the Secretary found a conversion. Nevertheless, the L & WCFA provides that wetlands within the state shall be considered of reasonably equivalent usefulness for all other property within the state. 16 U.S.C. § 460l-8(f)(3)
 
 
 [4]
 The state initially sought an opinion on Phase I testing, Phase II testing, Phase III testing, and commercial mining. Phase II and Phase III testing, as well as the commercial mining, involve a much more extensive intrusion on park property and are not at issue here. The National Park Service refused to render a decision on the request, claiming it needed further information. The National Park Service requested not only more detailed information on the various testing phases, but also a full analysis of environmental impacts under the National Environmental Policy Act. 42 U.S.C. §§ 4321 to 4347 (1988). The state subsequently updated and renewed its request, inquiring only as to the appropriateness of Phase I testing
 
 
 [5]
 Letter from Richard Marks, Acting Director of the Southwest Region of the National Park Service, to Jo Luck Wilson, Director of the Arkansas Department of Parks and Tourism (May 24, 1989) (Administrative R., Appellant's App. at 508)
 
 
 [6]
 Letter from Martin J. Suuberg, Associate Solicitor for Conservation and Wildlife in the Interior Department, to Gayle E. Manges, Southwest Region Field Solicitor (May 25, 1989) (Administrative R., Appellant's App. at 515)
 
 
 [7]
 After negotiations between the parties failed, the state began taking bids for Phase I testing. Appellees immediately petitioned for a temporary restraining order, which was treated by the court as a motion for preliminary injunction. The district court on June 25 granted appellant mining companies' motion to intervene. Capricorn Diamonds, Ltd., and Kennecott Corporation funded the Phase I testing and anticipate submitting bids if full-scale commercial mining is approved at the park
 
 
 [8]
 Letter from Richard Marks, Acting Director of the Southwest Region of the National Park Service, to Richard Davies, Acting Director of the Arkansas Department of Parks and Tourism (July 18, 1989) (Administrative R., Appellant's App. at 579)
 
 
 [9]
 The Secretary has delegated this determination to the regional director. Land and Water Conservation Fund Grants Manual, Chapter 675.9(3). The acting regional director's decision is reviewable as a final agency action under § 704 of the Administrative Procedure Act. 5 U.S.C. § 704 (1988). The Director of the Heritage Conservation and Recreation Service of the Interior Department, in a memorandum dated May 15, 1978, delegated the authority to approve conversion requests under § 6(f)(3) to the regional directors. The memorandum stipulated that only in cases in which the regional director recommended disapproval of a conversion request or the rejection of a proposed substitution would a report to the director be warranted. (Administrative R., Appellant's App. at 253)
 
 
 [10]
 The district court partially applied the wrong standard of review, concluding that the agency decision was "arbitrary, capricious, not supported by substantial evidence, and is contrary to the [law]." Sierra Club v. Davies, 743 F.Supp. 1334, 1341 (E.D.Ark.1990) (emphasis added). Under the Administrative Procedure Act, the "substantial evidence" standard applies only to agency decisions made under formal rulemaking procedures or formal adjudications. 5 U.S.C. § 706(2)(E); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971). The agency adjudication in this case was not made "on the record after opportunity for an agency hearing." 5 U.S.C. § 554 (1988)
 
 
 [11]
 The acting regional director did not articulate the basis for his decision that the Phase I testing was permissible as a temporary nonconforming use and, therefore, not a conversion under the L & WCFA. While this court should not itself supply a reasoned basis where the agency has not, the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Assn. v. State Farm Mut., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983), quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)
 
 
 [12]
 Memorandum from Interior Department's Director of Bureau of Outdoor Recreation to the Regional Director of the Northwest Region of the National Park Service (Feb. 8, 1974) (Administrative R., Appellant's App. at 262)
 
 
 [13]
 Memorandum from Interior Department's Director of Bureau of Outdoor Recreation to the Regional Director of the Northwest Region of the National Park Service (Feb. 8, 1974) (Administrative R., Appellant's App. at 262)
 
 
 [1]
 This letter is cited in the district court opinion. Sierra Club v. Davies, 743 F.Supp. 1334, 1337 (E.D.Ark.1990)
 
 
 [2]
 Where the acting regional director acts as the Secretary of the Interior under delegated authority, I will sometimes refer to the actions of the acting regional director as those of the Secretary
 
 
 [3]
 The majority opinion states that the district court's decision was based upon the premise that Phase I test drilling is "inextricably intertwined" with commercial mining. At 1189 ("The district court concluded that the initial testing was inextricably intertwined with mining and therefore constituted a nonrecreational use under the Act.") (emphasis added). To the contrary, the district court specifically stated "[e]ven if this Court should choose to regard Phase I testing as a separate, distinct activity, this Court would nevertheless construe Phase I testing as a conversion of park property to non-recreational use." Sierra Club v. Davies, 743 F.Supp. at 1339. Moreover, the district court considered the issue of whether or not Phase I testing could be "segmented" from commercial mining in the context of whether the State must prepare an environmental impact statement under the requirements of the National Environmental Policy Act; despite the district court's stated belief that segmentation was improper in this instance, the district court specifically found it "unnecessary to decide this issue at this time." Id. at 1340
 
 
 [4]
 This letter is cited in the district court opinion. Sierra Club v. Davies, 743 F.Supp. at 1339-40
 
 
 [5]
 The agency's May 1989 decision followed over a year and a half of consideration and study; two months later, the agency reversed itself