ST. CLOUD HOSPITAL, Plaintiff,

v.

Louis W. SULLIVAN, M.D. Secretary of the Department of Health and Human Services, Defendant.

Civ. No. 4–92–999.

United States District Court, D. Minnesota, Fourth Division.

Feb. 5, 1993.

Kevin J. Hughes, St. Cloud, MN, Ronald N. Sutter, Barbara E. Straub, Powers Pyles & Sutter, Washington, DC, for plaintiff.

Patricia R. Cangemi, U.S. Atty. Office, Minneapolis, MN, Sheila Lieber, U.S. Dept. of Justice, Federal Programs Branch, Joseph W. Lobue, U.S. Dept. of Justice, Federal Programs Branch—Civil Div., Washington, DC, for defendant.

## ORDER

DOTY, District Judge.

This matter is before the court on cross-motions for summary judgment. Plaintiff St. Cloud Hospital has asked the court to invalidate a new regulation promulgated by the Secretary of Health and Human Services ("the Secretary") alleging it is arbitrary and capricious, contrary to congressional intent, and inconsistent with the Medicare Act. The Secretary defends the regulation

as a valid exercise of his broad discretion under the Medicare Act. The issues have been fully briefed and argued and there are no material facts in dispute. Based on a review of the file, record and proceedings herein, the court grants the Secretary's motion for summary judgment and denies the plaintiff's motion for summary judgment.

## BACKGROUND

The Medicare Act, codified as Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq., establishes a system of health insurance for the aged and disabled. The Secretary is the federal official responsible for administering the program.

St. Cloud Hospital ("St. Cloud") is an acute care, nonprofit hospital located in St. Cloud, Minnesota. St. Cloud provides a broad range of health care services to elderly and other persons eligible for Medicare benefits and has been duly certified as a "provider of services" under the Medicare Act. *See* 42 U.S.C. § 1395x(u).

Under the Medicare Act, hospitals are not reimbursed for actual costs, but are funded under a prospective payment system. *Id.* § 1395cc.[1] The amount of reimbursement a hospital receives for a given service depends on its average standardized amount and the area wage index applicable to the hospital. Both the standardized amount and the applicable area wage index are based, in part, on the hospital's geographic location.

In 1989, Congress amended the statutory provisions relating to geographic classification by adding section 1886(d)(10) to the Medicare Act. Pub.L. No. 101–239, § 6003(h)(1), 103 Stat. 2154–2156 (Dec. 19, 1989) (codified at 42 U.S.C. § 1395ww(d)(10)). The provision permits a hospital to seek reclassification to a different geographic area for purposes of using the other area's standardized amount, wage index or both.[2] Under the 1989 amendment, all requests for geographic reclassification are decided by the Medicare Geographic Classification Review Board ("the Board"). 42 U.S.C. § 1395ww(d)(10)(C). The Medicare Act does not specify the exact criteria a hospital must satisfy to be reclassified. Rather, it directs the Secretary to promulgate guidelines to be used by the Board in making reclassification decisions. Section 1395ww(d)(10)(D) provides in pertinent part:

(i) The Secretary shall publish guidelines to be utilized by the Board in rendering decisions on applications submitted under this paragraph, and shall include in such guidelines the following:

(I) Guidelines for comparing wages, taking into account occupational mix, in the area in which the hospital is classified and the area to which the hospital is applying to be classified.

42 U.S.C. § 1395ww(d)(10)(D).[3] Besides the factors identified in the statute, Congress vested discretion in the Secretary to establish reclassification criteria.

The Secretary published an interim rule containing guidelines for reclassification on September 6, 1990, and a final rule on June 4, 1991. 55 Fed.Reg. 36754 (Sept. 6, 1990); 56 Fed.Reg. 25458 (June 4, 1991), *codified at* 42 C.F.R. §§ 412.230–236. A hospital qualified for reclassification to an adjacent geographic area if it satisfied certain proximity requirements and its average hourly

---

1. The prospective payment system was intended to improve the Medicare program's ability to act as a "prudent purchaser of services, and to provide predictability regarding payment amounts for both the Government and the hospitals." H.R.Rep. No. 25, 98th Cong., 1st Sess. 132 (1983), *reprinted at* 1983 U.S.Code Cong. & Admin.News 219, 351.

2. Only the requirements for geographic reclassification for wage index are at issue in this case.

3. The Secretary is also instructed to include:

(II) Guidelines for determining whether the county in which the hospital is located should be treated as part of a particular Metropolitan Statistical Area.
(III) Guidelines for considering information provided by an applicant with respect to the effects of the hospital's geographic classification on access to inpatient services by medicare beneficiaries.
(IV) Guidelines for considering the appropriateness of the criteria used to define New England County Metropolitan Areas.
42 U.S.C. § 1395ww(d)(10)(D)(i).

wage was comparable to the average in the adjacent area. 42 C.F.R. § 412.230(a)–(c). A hospital's average hourly wage was deemed comparable to wages paid in an adjacent area if it was at least 85 percent of the average for the adjacent area. *Id.* at (e)(1).[4] Thus, a hospital meeting the proximity requirement simply had to demonstrate its wages were at least 85 percent of the average hourly wage in the adjacent area to qualify for reclassification.

In the preamble to the interim rule, the Secretary noted it lacked the necessary data to estimate the impact on hospitals and that it was possible the reclassification provisions could create effects that were unintended or costly. 55 Fed.Reg. 36754, 36765 (Sept. 6, 1990). In the preamble to the final rule, the Secretary said he planned to evaluate the propriety of reclassifications under the original guidelines to see if they were either too liberal or stringent. 56 Fed.Reg. 25458, 25470 (June 4, 1991). On August 30, 1991, the Secretary again stated he intended to evaluate the reclassifications made under the original guidelines and, if necessary, propose revisions. 56 Fed.Reg. 43196, 43202 (Aug. 30, 1991).

Using the original guidelines, the Board reclassified 930 hospitals in fiscal year 1992, including more than 843 hospitals reclassified for their wage index. 57 Fed. Reg. 23618, 23632 (June 4, 1992). On average, payments received by each reclassified hospital increased 5.9 percent in fiscal year 1992. *Id.* The Medicare Act requires any increase in payments via reclassification be "budget neutral." 42 U.S.C. § 1395ww(d)(8)(D).[5] Accordingly, in-

creased payments to reclassified hospitals must be offset by reducing payments to other hospitals. During 1992, higher payments to reclassified hospitals were funded by decreasing payments to urban hospitals nationwide by 1.1 percent. 57 Fed.Reg. at 23632.

To assess whether the wage index reclassifications were operating as intended, the Secretary examined 815 hospitals reclassified for their wage index in fiscal year 1992. 57 Fed.Reg. at 23634–635. The Secretary compared the average hourly wages of the reclassified hospitals and the average hourly wages in their original labor markets. The Secretary found that 36 percent of the reclassified hospitals had wages that were less than the average in the area in which they were located. *Id.* at 23634. Even though the wage index where the hospitals were located exceeded the wages they actually paid, the hospitals qualified for reclassification to areas with even higher wages under the original guidelines. The Secretary found another 35 percent of the reclassified hospitals paid wages that were less than 108 percent of the average hourly wage in the area in which they were located. *Id.* at 23634–635.[6]

The Secretary concluded the original guidelines reclassified too many hospitals that were not disadvantaged by the wage index in their old area. *Id.* at 23635. The Secretary stated:

> "[T]he reclassification process was established to provide a mechanism that would allow hospitals to effect a change in their geographic location only in those situations where hospitals had been clearly disadvantaged by their current

---

**4.** The regulations also provide that a hospital qualified for reclassification if its average hourly wage, adjusted for occupational mix, was at least 90 percent of the average for the adjacent area. 42 C.F.R. § 412.230(e)(1)(iii)(B).

**5.** The "budget neutrality" provision of the Medicare Act provides in pertinent part:

> (D) The Secretary shall make a proportional adjustment in the standardized amounts ... for hospitals located in an urban area to assure that ... a decision of the [Board] or the Secretary ... [does] not result in aggregate payments under this section that are

greater or less than those that would otherwise be made.

42 U.S.C. § 1395ww(d)(8)(D).

**6.** The Board, using the original guidelines, approved 1,243 hospital reclassifications for fiscal year 1993. 57 Fed.Reg. 39746, 39991 (Sept. 1, 1992). As a result, payments to urban hospitals nationwide were reduced by 1.3 percent. *Id.* at 39993. Most hospitals were reclassified for purposes of their wage index. *Id.* at 39991. Approximately 75 percent of reclassified hospitals had an average hourly wage less than 108 percent of the wage index in their area. *Id.* at 39993.

classification. [As the analysis of the fiscal year 1992 reclassifications] demonstrates, however, hospitals may be reclassified under the current wage guidelines even though, as evidenced by the relationship between their average hourly wages and their old wage area, they may not be disadvantaged by remaining in their original labor market area.... [The Secretary proposes] to revise the guidelines to ensure that hospitals are appropriately reclassified. [The Secretary believes] that a hospital should not be reclassified unless its average hourly wage is significantly out-of-line with the average hourly wages of the area in which it is located and is in line with the average hourly wages of the area to which it requests reclassification."

*Id.* The Secretary published for comment on June 4, 1992, a proposed regulation which allows reclassification only where a hospital is significantly disadvantaged by its current wage index. *Id.* A hospital is significantly disadvantaged if its "average hourly wage is at least 108 percent of the average hourly wage of hospitals paid in the area in which the hospital is located." *Id.* at 23683 (to be codified at 42 C.F.R. § 412.230(e)(iii)).[7]

In proposing the 108 percent rule, the Secretary considered three other options. One alternative was to require a hospital's wages be at least as great as the hourly wage in the area in which it was located. *Id.* at 23635. The Secretary concluded that it was "more appropriate to adopt a guideline that would require a hospital to have an average hourly wage that is out of line with its own labor market." *Id.* Second, the Secretary considered requiring a hospital's wages be at least 115 percent of the average hourly wage in the area in which it was located. *Id.* The Secretary decided, however, that a 115 percent standard was too stringent. *Id.* at 23636. Finally, the Secretary considered proposing no change in the reclassification guidelines. The Secretary rejected this option citing the budget

neutrality requirement and his "responsibility to all hospitals to ensure that only appropriate reclassifications occur." *Id.* The Secretary also emphasized that a substantial number of hospitals were reclassified that were not disadvantaged by the wage index in their area. *Id.*

The Secretary invited public reaction on the proposed changes to the reclassification guidelines and received over 350 comments on the 108 percent rule. 57 Fed.Reg. 39746, 39770 (Sept. 1, 1992). Not surprisingly, hospitals located in large urban areas that funded, but did not benefit from geographic reclassifications, supported the 108 percent rule. *Id.* In contrast, strong opposition was expressed by hospitals that were reclassified for their wage index under the original guidelines. *Id.* The natural bias of hospitals affected by reclassifications does not extend to the Prospective Payment Assessment Commission ("the Commission"), a panel of independent experts which Congress has charged with evaluating and making recommendations to the Secretary on the prospective payment system, 42 U.S.C. § 1395ww(e)(2)(A) & (B). The Commission approved the 108 percent rule stating:

The Commission supports and endorses [changes to the current geographic reclassification criteria]. The Secretary has identified a serious problem with the current criteria for geographic reclassification of hospitals for the purpose of the wage index. The analysis discussed in the proposed rule clearly demonstrates that many of the hospitals approved for reclassification for fiscal years 1992 and 1993 under the current criteria would not have been significantly disadvantaged by receiving [prospective payment system] payments based on the wage indexes for their original labor market areas. The Secretary proposes to correct this deficiency by limiting reclassification to only those hospitals whose average hourly wages are at least 108 percent of the average wages of the area in which they

---

**7.** Hereinafter "the 108 percent rule." The 108 percent threshold is based on the national average hospital wage as a percentage of its area wage (96 percent) plus one standard deviation

(12 percent). 57 Fed.Reg. 23618, 23635 (June 4, 1992); 57 Fed.Reg. 39746, 39770 (Sept. 1, 1992). The 108 percent rule applies to reclassifications for fiscal year 1994.

are located, and at least 84 percent of the wages of hospitals in the area to which they are seeking reclassification.... The Commission believes the Secretary's solution strikes a reasonable balance between the need to provide relief to hospitals disadvantaged by their current geographic classification and the need to avoid inappropriate reclassification.

Admin.Rec. at 2911.

The Secretary considered and responded to but ultimately rejected the arguments opposing the 108 percent requirement. *See, e.g.,* 57 Fed.Reg. 39746, 39770–778 (Sept. 1, 1992). On September 1, 1992, the Secretary published a final rule adopting the 108 percent rule. 57 Fed.Reg. 39826 (Sept. 1, 1992).[8]

St. Cloud was reclassified to the Minneapolis–St. Paul area wage index for fiscal years 1992 and 1993. St. Cloud applied for reclassification to the Minneapolis–St. Paul area wage index for fiscal year 1994. St. Cloud satisfies some, but not all, of the criteria for using the Minneapolis–St. Paul area wage index. It is undisputed that St. Cloud meets the proximity and adjacency requirements and that its wages are at least 84 percent of those paid by hospitals in Minneapolis–St. Paul. St. Cloud acknowledges, however, that it does not meet the new 108 percent requirement.[9] St. Cloud filed this lawsuit challenging the validity of the 108 percent rule. St. Cloud charges that the 108 percent rule is arbitrary and capricious, contrary to congressional intent, and inconsistent with the Medicare Act.

## STANDARD OF JUDICIAL REVIEW

Judicial review of agency action is governed by the Administrative Procedure Act, which authorizes courts to set aside agency action, findings, and conclusions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

To determine whether an agency's decision was arbitrary and capricious, the court must determine whether the decision was based on the relevant factors and whether there has been a clear error of judgment. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). While the court's inquiry must be searching, the ultimate standard of review is a narrow one. The court is not permitted to substitute its judgment for that of the agency. *Id.; Sierra Club v. Davies,* 955 F.2d 1188, 1192–93 (8th Cir.1992). The agency, however, is required to provide an explanation for its decision, including a rational connection between factors considered and the decision made. *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

When reviewing an agency's construction of a statute the agency has been entrusted to administer, the court's analysis is two-fold. If Congress has spoken to the precise question at issue, the analysis is complete. The court, as well as the agency, "must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). But where the court determines that Congress has not spoken directly to the issue at hand, the court may not impose its own construction of the statute. Rather, the court's analysis is limited to whether the agency's construction of the statute was permissible. *Id.* at 843, 104 S.Ct. at 2781. If the agency was charged with administering a congressionally created program, it

---

**8.** To be consistent, the Secretary lowered the 85 percent standard for the relationship between a hospital's wages and the average hourly wage of the area to which it seeks reclassification by one percentage point (84 percent). 57 Fed.Reg. 23618, 23635 (June 4, 1992); 57 Fed.Reg. 39746, 39770 (Sept. 1, 1992). Thus, to qualify for a wage index reclassification, a hospital must have an average hourly wage that is more than one national standard deviation above its original labor market and not less than one national deviation standard below its new labor market. *Id.*

**9.** St. Cloud's wages exceed the average hourly wage in its geographic area by approximately 5 percent.

necessarily was vested with policy making power and is authorized to fill in any gap that may have been left by Congress. *Id.* In that situation, the court must give "controlling weight" to the agency's regulations "unless they are arbitrary, capricious or manifestly contrary to the statute" or the intent of Congress. *Id.* at 844, 104 S.Ct. at 2782.

## DISCUSSION

Congress expressly directed the Secretary to "publish guidelines to be utilized by the Board in rendering decisions on [reclassification] applications." 42 U.S.C. § 1395ww(d)(10)(D)(i). But it did not speak to whether a comparison between a hospital's wages and the average hourly wages in its own area should be used as a guideline for geographic reclassification. Because Congress delegated to the Secretary the authority to implement the Medicare Act but was silent as to the exact means to carry out that task, the court must give considerable deference to the Secretary's decisions. *See, e.g., Chevron,* 467 U.S. at 844–45, 104 S.Ct. at 2782–83. Judicial deference is particularly appropriate here because the Secretary's obligation to establish reclassification guidelines involves an "accommodation of conflicting policies that were committed to the agency's care by the statute." *Id.* at 845, 104 S.Ct. at 2783 (citations omitted).

The Secretary, as the administrator of the Medicare Act, is in a unique position to evaluate and reconcile the competing policy concerns within the Medicare program. The Secretary's duty to ensure budget neutrality is at odds with his obligation to reclassify hospitals so they may receive increased Medicare payments. The Secretary has a duty to assure both that those hospitals meriting reclassification are afforded proper consideration and that other hospitals are protected from the effects of inappropriate reclassification. The Court must give controlling weight to the Secretary's policy making decisions and will defer to them "unless it appears from the statute or legislative history that the accommodation is not one that Congress

would have sanctioned." *Id.* (citations omitted).

St. Cloud argues the 108 percent rule is entitled to no or little deference because it departs from the Secretary's prior interpretation of § 1395ww(d)(10)(D). St. Cloud contends that the Secretary's initial interpretation of the reclassification provisions focused solely on whether a hospital competes with or is more like hospitals in another geographic area. The 108 percent rule, however, looks at whether a hospital's wages are significantly out of line with the average wage paid in the hospital's own area. The court does not consider the adoption of the 108 percent rule a radical departure from the Secretary's initial construction of the statute. The Secretary has not retracted his previous interpretation, rather he has expanded the reclassification criteria to include a standard for measuring whether a hospital that competes with hospitals in another area is significantly hurt by its current wage index.

Even assuming the 108 percent rule departs radically from the Secretary's prior interpretation of the Medicare Act, the role of the reviewing court is the same. A revised interpretation deserves deference because an agency "must be given ample latitude to adapt [its] rules and policies to the demands of changing circumstances." *Motor Vehicles,* 463 U.S. at 42, 103 S.Ct. at 2866 (citations omitted). The Supreme Court has made clear that an agency's interpretation of a statute is entitled to deference even where it "represents a sharp break with prior interpretations." *Rust v. Sullivan,* —— U.S. ——, ——, 111 S.Ct. 1759, 1769, 114 L.Ed.2d 233 (1991); *Chevron,* 467 U.S. at 862, 104 S.Ct. at 2791.

### 1. Congressional Intent

St. Cloud argues that the 108 percent rule is completely inconsistent with congressional intent in establishing the Board and the geographic reclassification process. St. Cloud claims the intent of Congress can be ascertained from a 1990 congressional report that discusses the original reclassification guidelines proposed

by the Secretary. The House Committee Conference Report states:

> . The conferees are also concerned that the thresholds for consideration of reclassifications by the Board may be set too high and would urge the Secretary to consider changing them. In particular, the Committee is concerned that the 85 percent criterion for average hourly wages is too high and that the Secretary should consider a threshold of 70 percent for this purpose.

H.R.Conf.Rep. No. 964, 101st Cong., 2d Sess. 715 (1990), *reprinted in* U.S.Code Cong. & Admin.News 2017, 2040. St. Cloud insists the conference report "unquestionably proves that Congress did not intend for the Secretary to adopt a standard as restrictive as the 108 percent rule." The court does not agree with St. Cloud's leap in reasoning.

The conference report is irrelevant to the validity of the regulation at issue here. The comments in the conference report were made only weeks after the original guidelines were initially proposed and almost a year before any reclassification decisions of the Board became effective. Thus, the caution expressed by the conferees was not based on results under the original guidelines. For the most part, the report is unilluminating. It does not tell what other factors Congress did or did not intend the Secretary to consider when fashioning the criteria for reclassification. The remarks pointed to by St. Cloud "were obviously not made with this narrow issue in mind and they cannot be said to demonstrate a congressional desire." *Chevron*, 467 U.S. at 862, 104 S.Ct. at 2791 (citations omitted). Ironically, the little congressional intent that can be discerned from the conference report cuts against St. Cloud's position in this case. Congress could have added the 70 percent threshold to the legislation it enacted amending the Medicare Act. Instead, it identified an issue it believed the Secretary should reconsider and left the ultimate decision to the Secretary.

St. Cloud contends that the conference report, at the very least, reveals Congress did not intend for the Secretary to adopt any standard that would make the criteria for reclassification more stringent. Once again the court finds the report fails to shed any light on the issue at hand. The report shows only that the conferees suspected the 85 percent standard might be too strict. Because the conferees had no way of knowing how the guidelines would operate in fact, however, their premature concern does not offer much assistance to the court. Congress did not even hint at a minimum number of hospitals it intended to be reclassified under the guidelines. Rather, it left the line drawing and policy making decisions to the Secretary. It is undisputed that the 108 percent rule will drastically reduce the number of hospitals that will qualify for reclassification for wage index purposes.[10] Perhaps St. Cloud is correct in claiming the 108 percent rule swings the pendulum too far in the other direction. Congress intended, however, for the Secretary, not the court, to make that call. Even assuming there is a better method by which to reclassify hospitals, the law requires only that the Secretary's chosen approach be reasonable. *See, e.g., Chevron*, 467 U.S. at 865, 104 S.Ct. at 2792.

St. Cloud argues that Congress approved the original guidelines when it amended the Medicare Act in 1990, including a number of revisions to the reclassification provisions, but left the original guidelines intact. St. Cloud insists the original guidelines accurately reflected the intent of Congress and, therefore, the Secretary cannot alter them. The lack of congressional action may indicate that Congress generally endorsed the original guidelines. It cannot be relied on, however, to usurp the Secretary's authority to consider other factors or revise the regulations. It is absurd to charge Congress with anticipating and ruling out every additional criteria for reclassification that the Secretary could propose in the future. Clearly the original guidelines coincide with St. Cloud's reading of

---

**10.** The Secretary estimated that 89 percent of the urban hospitals and 66 percent of the rural hospitals reclassified under the original criteria would no longer qualify for reclassification. 57 Fed.Reg. 23618, 23636 (June 4, 1992).

congressional intent and St. Cloud would like to lock the Secretary into the guidelines as initially espoused. But under no stretch of the imagination does the conference report suggest that Congress intended the original regulations adopted by the Secretary to be carved in stone. To the contrary, the discretion vested in the Secretary necessarily entails the power to amend the reclassification criteria in light of the Secretary's actual experience.

## 2. Express Language of the Medicare Act

 St. Cloud also claims the 108 percent rule is contrary to the Medicare Act itself. St. Cloud does not contend the four factors listed by Congress for inclusion in the reclassification guidelines are exclusive. *See* 42 U.S.C. § 1395ww(d)(10)(D).[11] Rather, St. Cloud argues that the 108 percent rule is inconsistent with the Medicare Act because it nullifies a factor which Congress explicitly directed the Secretary to consider. As noted above, Congress instructed the Secretary to include:

> (I) Guidelines for comparing wages, taking into account occupational mix, in the area in which the hospital is classified and the area to which the hospital is applying.

42 U.S.C. Section 1395ww(d)(10)(D)(i)(I). The reclassification guidelines compare a hospital's wages with the wages of hospitals in another geographic area by requiring that a hospital's wages be at least 84 percent of the average hourly wage in the area to which it seeks to reclassify. St. Cloud agrees the 84 percent rule is consistent with the statutory language. It argues, however, that the 108 percent rule renders the comparison dictated by Congress "meaningless" because "any hospital which meets the 108 percent standard will also meet the 84 percent standard."

St. Cloud's argument, though initially appealing, is flawed. The fundamental problem with St. Cloud's argument is that it isolates one component of reclassification to the exclusion of other relevant components. It is clear that competition is a germane factor in the reclassification scheme envisioned by Congress. It is also apparent that St. Cloud believes competition should be the key criteria for reclassification. The Medicare Act, however, does not make competition more critical than any other standard the Secretary may devise. The statute simply denotes that a comparison between the wages paid in the hospital's area and those in another area is relevant to reclassification decisions. There is no requirement under the statute that a certain number of hospitals be reclassified based solely on whether or not they compete with hospitals in another area. Nor is there any statutory bar against competition serving merely as a precondition for reclassification. Accordingly, the 108 percent rule does not contravene the standards for reclassification set forth by Congress.

St. Cloud has not demonstrated that the 108 percent rule renders the 84 percent standard obsolete. The Secretary has not abandoned competition as a criteria for reclassification. A hospital must compete with hospitals in another geographic area to be reclassified. The 108 percent rule compares a hospital's wages and the average hourly wage in the area in which it is located. Requiring a hospital to demonstrate that its wages are way out of line with the wages paid in its own area does not abrogate the comparison made between the hospital's wages and wages paid in another geographic area.

In essence, what lies at the heart of St. Cloud's statutory argument is its insistence that the Secretary considered a factor which Congress did not intend to be used in reclassification decisions. Thus, in a roundabout way, St. Cloud argues that the factors identified in the statute preclude the Secretary from considering other crite-

---

**11.** The District Court and the Court of Appeals for the District of Columbia have rejected the contention that the four factors enumerated in the statute are exclusive. *See Universal Health Servs. of McAllen, Inc. v. Sullivan*, 770 F.Supp. 704, 716 (D.D.C.1991), *aff'd mem.*, 978 F.2d 745 (D.C.Cir.1992) ("use of the word "include" evinces Congress' conferral of authority to promulgate guidelines in addition to those expressly mentioned in the [Medicare] Act"). *Accord Ath-*

ria. The Medicare Act, however, does not prevent the Secretary from designating the gap between a hospital's wages and the wages paid in its own area as the primary indicator of whether a hospital should be reclassified. To the contrary, the statute gives the Secretary the authority to consider and adopt additional reclassification criteria.

### 3. Arbitrary and Capricious

■ St. Cloud argues that the Secretary's 108 percent rule is arbitrary and capricious. St. Cloud claims the Secretary failed to fulfill his obligation to "examine the relevant data and articulate a rational connection between the facts found and the choices made." *Motor Vehicles*, 463 U.S. at 43, 103 S.Ct. at 2866 (citations omitted). St. Cloud also contends the 108 percent rule is irrational and produces absurd results.

St. Cloud contends the 108 percent rule is irrational because it does not further certain goals articulated by the Secretary. St. Cloud's argument relies heavily on two statements made by the Secretary when the original guidelines were adopted. At that time, the Secretary stated reclassifications "should be limited to those hospitals which are disadvantaged by their current geographic classification because they compete with the hospitals that are located in the geographic area to which they seek to be reclassified." 56 Fed.Reg. 25458, 25469 (June 4, 1991). The Secretary also stated that he believed the guidelines addressed "those situations where a hospital competes in the same market with hospitals in an adjacent area; that is the hospital is more like the hospitals in an adjacent area than the hospitals in its geographic area." *Id.*[12] St. Cloud contends the 108 percent rule does not advance those goals because it prevents reclassification of hospitals, such as St. Cloud, that compete with and are "more like" hospitals in an adjacent geographic area. Therefore, it argues that the rule is invalid.

St. Cloud's argument glosses over shortcomings observed in the original guidelines as applied. The statements relied on by St. Cloud were made when the original guidelines were adopted. No doubt the Secretary believed at the time that comparing a hospital's wages with those in the area to which it sought to reclassify would ensure accurate reclassifications. *See, e.g.,* 57 Fed.Reg. 39746, 39772 (Sept. 2, 1992). Since that time, however, the Secretary discovered that one-third of the hospitals reclassified under the original guidelines had wages that were less than the average hourly wages in their area. The Secretary also found an equal number of reclassified hospitals had wages that were not much higher than the average hourly wages paid in their area. The Secretary concluded that the guidelines were too lenient and the 108 percent rule was necessary to limit reclassifications to hospitals significantly disadvantaged by their current wage index. The court finds the Secretary's decision to correct what it perceived as a defect in the original guidelines and its method for doing so are neither arbitrary nor capricious.

St. Cloud also ignores relevant statements made by the Secretary as well as other goals of reclassification. At the same time the remarks relied on by St. Cloud were made, the Secretary stated he planned to evaluate the propriety of reclassifications under the original guidelines and, if necessary, propose revisions. 56 Fed.Reg. 25458, 25469 (June 4, 1991). *See* 57 Fed.Reg. 43196, 43202 (Aug. 30, 1991). Thus, from the start, the Secretary made clear he would modify the original guidelines if they failed to operate as intended. After analyzing hospitals reclassified in fiscal year 1992, the Secretary concluded that even though they competed with hospitals in another area, many reclassified hospitals were not "significantly disadvantaged by remaining in their original labor market area." 57 Fed.Reg. 39746, 39772 (Sept. 2, 1992). The Secretary stated that the re-

---

ens *Community Hospital v. Sullivan,* 815 F.Supp. 1 (D.D.C.1992).

**12.** St. Cloud also cites the decision in *Universal Health Servs.,* 770 F.Supp. at 714, which held

reclassification was meant "to adequately compensate hospitals that face increased costs due to competition with hospitals in geographic areas reimbursed at higher rates under the Medicare program."

classification process was "aimed at ensuring the overall fairness of the prospective payment system for all affected hospitals." *Id.* The purpose of the 108 percent rule was to "ensure that a significant difference in wages exists before reclassification is permitted." *Id.* at 39774. When viewed in the context of the Secretary's experience under the original guidelines, rather than the limited remarks relied on by St. Cloud, the 108 percent rule cannot be considered irrational. The court finds the 108 percent rule is rationally related to the facts found by the Secretary and that the choice made was a reasonable one.

Finally, St. Cloud's argument disregards the Secretary's obligation to accommodate the conflicting policies that were entrusted to his care by the Medicare Act. The Secretary's duty under the budget neutrality requirement and his duty to devise reclassification guidelines consistent with the purpose of the statutory language are tasks of equal importance. As the Secretary noted in response to public comments on the proposed 108 percent rule:

> [T]he Secretary is equally responsible for assuring that hospitals meriting reclassification are afforded proper consideration and for protecting other hospitals against any effects of the budget neutrality adjustment which may result from inappropriate reclassifications.

> * * * * * *

> [The Secretary has an] obligation to ensure that reclassifications are granted only to those hospitals that truly warrant such reclassification because they are disadvantaged by their original labor market designation.... [The Secretary has] a responsibility to revise the guidelines in order to improve payment equity across all hospitals.

57 Fed.Reg. at 39771 & 39778. Obviously, there is a certain amount of tension between these two charges. The Secretary decided "the inclusion of the 108 percent threshold in the guidelines fulfills this dual responsibility." *Id.* at 39771. The Secretary estimated that 71 percent of the hospitals reclassified in fiscal year 1992 would not satisfy the 108 percent rule and that

payments to urban hospitals nationwide would have been reduced by 0.57 percent instead of 1.1 percent. 57 Fed.Reg. 23618, 23636 (June 4, 1991). The court finds that the Secretary reasonably concluded that comparing a hospital's wages with the wages paid in its own area would help achieve more appropriate reclassifications.

St. Cloud also contends that the 108 percent rule is irrational because it does not reclassify hospitals which are disadvantaged by their current wage index. It is undisputed that St. Cloud's current wage index is lower than the wages it actually pays. St. Cloud's wages exceed the average hourly wage in its area by about 5 percent. It is also clear that St. Cloud does not consider the wage index in its area adequate. But under the 108 percent rule, St. Cloud's wages are not out of line with its current wage index because they do not exceed the average hourly wage in its area by 8 percent. Thus, St. Cloud is not "significantly disadvantaged" by its current wage index and does not qualify for reclassification. Obviously hospitals with wages above the average in their area are not fully compensated by the wage index. The Secretary determined, however, that the wage costs of such hospitals are within the normal range of wage variation within a geographic area. 57 Fed.Reg. at 39773. While St. Cloud may disagree with the Secretary's decision, that does not provide a reason to invalidate the 108 percent rule.

St. Cloud attacks the 108 percent rule by pointing to other factors which it believes the Secretary should have considered. St. Cloud argues, for example, that the Secretary should have designed reclassification criteria that take into account the size of the hospital, including the amount of wages paid during a particular year, the number of employees and the number of beds. The Secretary is not required, however, to engage in the type of exhaustive rulemaking process urged by St. Cloud. The law does not require the Secretary "to consider all policy alternatives in reaching [his] decision." *Motor Vehicles,* 463 U.S. at 51, 103 S.Ct. at 2870. Nor can rulemaking "be found wanting simply because the

agency failed to include every alternative device and thought conceivable by the mind of man." *Id.* (citations omitted). It is enough that the Secretary stated his decision and the determinative reasons for it. The Secretary was not obligated to consider the additional factors proposed by St. Cloud. Accordingly, the court does not find the 108 percent rule to be arbitrary and capricious.

Finally, St. Cloud contends that even if the Secretary's decision to impose the 108 percent rule is rationally based, the 108 percent threshold is riddled with defects and should be discarded. St. Cloud claims the 108 percent rule is illogical as applied because the Secretary uses outdated wage data from 1988 that does not account for changes in wages that have occurred since that time. In addition, St. Cloud contends the Secretary ignored the effects of prior reclassifications. St. Cloud also contends the 108 percent threshold is statistically flawed. Specifically, St. Cloud claims the Secretary: (1) should exclude a hospital's own wages from the area average when applying the 108 percent rule; (2) failed to justify the use of the standard deviation for computing the 108 percent rule; and (3) illogically based the 108 percent rule on a national average and national standard deviation rather than local figures.

St. Cloud contends the Secretary's use of 1988 wage data for purposes of the 108 percent rule is illogical. St. Cloud concedes that current wage data is not available. St. Cloud does not, however, offer a more accurate source of verified wage data that the Secretary can apply on a national level. Instead, it argues that the 108 percent threshold is a "data-sensitive rule" which cannot be rationally applied based on outdated wage data from 1988. St. Cloud's attempt to limit its argument to the 108 percent rule is unconvincing. All wage comparisons for fiscal year 1994 will utilize the 1988 wage data, therefore, St. Cloud's claim implicates the application of other reclassification guidelines. St. Cloud has not demonstrated that comparing a hospital's wages to the wages paid in its own area is any more "data-sensitive" than comparing its wages to those paid by hospitals in another area.

The Secretary considered using updated data in applying the reclassification criteria for fiscal year 1994. *See, e.g.,* 57 Fed.Reg. 39746, 39779 (Sept. 1, 1992). The Secretary reasoned that to ensure all hospitals were treated in an evenhanded manner, it was essential to use standard data for the same time period so that the wage comparisons appropriately reflected labor costs for the same point in time. 57 Fed.Reg. 23618, 23633 (June 4, 1992). The Secretary concluded that the 1988 wage data represents the latest complete database on which valid comparisons can be made across all areas. 57 Fed.Reg. at 39779. The Secretary is not required to make adjustments for changes in wages that might have occurred since 1988 on a case-by-case basis. Nor does the fact that the only standard data available is somewhat outdated preclude the Secretary from making wage comparisons for fiscal year 1994.[13] The court finds the Secretary's decision to use the 1988 wage data in determining reclassifications for fiscal year 1994 is logical.

St. Cloud also claims the Secretary ignored the effect of prior reclassifications. In particular, St. Cloud contends the Secretary disregarded the possibility that hospitals reclassified under the original guidelines may have altered their wages and operations in reliance on prior reclassifications. The Secretary recognized "that the revised guidelines may create difficulties for those hospitals that have altered their operations in anticipation of continued reclassification." 57 Fed.Reg. at 39778. However, the Secretary decided it would be inappropriate to delay adoption of the 108 percent rule because "[t]he benefits of providing additional adjustment time to these hospitals must be balanced against continuing to disadvantage non-classified hospitals

---

**13.** The Medicare Act now requires annual updates of wage data beginning October 31, 1993. 42 U.S.C. § 1395ww(d)(3)(E). Because hospitals must apply for reclassification one year before the reclassification takes effect, however, updated wage data will not be available for reclassifications for fiscal year 1994.

through the budget neutrality adjustment." *Id.* The court concludes that the Secretary considered the impact of prior reclassifications and made a rational decision that reasonably accommodated the conflicting policies entrusted to his care.

St. Cloud's claim that the 108 percent threshold is statistically unsound is without merit. St. Cloud disputes the Secretary's decision to include the wages of the hospital itself in the computation of the average hourly wage of its area and argues the hospital's own wages should be excluded from the area average for purposes of making the 108 percent comparison. St. Cloud contends it makes no sense to determine if a hospital's wages are out-of-line with an average when its wages are used in computing the average. The Secretary considered this argument and rejected it with reasoning the court finds persuasive. The Secretary stated:

"The 108 percent threshold is used to determine whether the average hourly wage that is used in calculating the wage index adjustment with which the hospital is currently being paid adequately represents the hospital's wages costs. Since that hospital's wages are included in the determination of the area wage index, it is appropriate that its wages be included in the area average in order to make a valid determination of whether the hospital is disadvantaged by its current wage index adjustment. Moreover, in establishing the 108 percent threshold, the comparison is not intended to measure whether a hospital's wage data are out of line with the wage data of other hospitals in the labor market area; instead, the comparison is intended to measure whether the hospital's wages are out of line with the wage level used to set the wage index for the hospital's labor market area. Therefore, the wages for the hospital requesting reclassification must be included in its labor market area when applying the 108 percent wage test."

57 Fed.Reg. at 39773. The court concludes the Secretary's decision to compare a hospital's wages to the average hourly wage paid by all hospitals in its area was logical.

St. Cloud also criticizes the Secretary's decision to apply a national average standard to determine whether a hospital is significantly disadvantaged by its wage index. St. Cloud contends the Secretary should measure wage variation on a local rather than national level. The Secretary decided not to use local data to compute the range of variation for two reasons. First, the Secretary concluded that "since the geographic reclassification process is applied on a national basis, it is appropriate to develop a standard that can be applied to all hospitals in a consistent and uniform manner. A national standard based on the average variation in wages across all areas meets this objective; area-specific standards do not." 57 Fed.Reg. at 39772. Second, the Secretary recognized that "[a]rea-specific standards would be much more sensitive to differences in the number of hospitals across labor market areas than is the national standard." *Id.* at 39773. But the Secretary concluded that the variation in the number of hospitals in particular areas "should not be a factor that influences the criteria for whether a hospital qualifies for reclassification." *Id.* The court finds the Secretary's decision to create a standard based on national data from all areas that could be applied uniformly and evenhandedly to all hospitals was reasonable.

Finally, St. Cloud claims the 108 percent threshold is an arbitrary figure and that the Secretary offered no logical reason for selecting the standard deviation as a proper measure for computing the 108 percent threshold. However, the Secretary explained that the actual threshold was determined by using "the standard deviation as a reasonable measure of divergence between a hospital's own wage level and the average for its area." 57 Fed.Reg. at 39773. The purpose of the 108 percent rule was to allow reclassification where a hospital's wages exceeded the normal range of wage variation within its labor market area. The Secretary defined the "normal range as within one national standard deviation of the average hourly wage." *Id.* The Secretary determined the 108 percent threshold was needed to ensure that only

hospitals seriously disadvantaged by their current wage index qualified for reclassification. In addition, the Secretary considered but rejected two other options when he proposed the 108 percent rule. One alternative suggested was to require a hospital's wages be at least 100 percent of the average hourly wage in the area in which it was located. *See, e.g.,* 57 Fed.Reg. 23648, 23635 (June 4, 1992). The Secretary concluded, however, that a hospital that received a wage index based on 100 percent of its own wages was not significantly disadvantaged by its current classification. *Id. See, e.g.,* 57 Fed.Reg. at 39773. The Secretary also considered requiring a hospital's wages be at least 115 percent of the average hourly wage in the area in which it was located. *Id.* The Secretary decided, however, that a 115 percent standard was too stringent. *Id.* at 23636.

The court concludes that the Secretary sufficiently explained his reasons for employing the 108 percent threshold and that his decision was reasonable. The court finds the 108 percent rule is based on relevant data and was not arbitrarily selected.

### CONCLUSION

In sum, the court finds that the legislative history is ambiguous and fails to shed light on relevant congressional intent. St. Cloud's attempt to transform the isolated remarks in one conference report into an accurate revelation of congressional intent is unavailing. While St. Cloud's interpretation of congressional intent may be a permissible one, it is by no means the only one, and it is not the one found by the Secretary. It is well established that legislative history which does not demonstrate a clear and certain congressional intent cannot form the basis for invalidating an agency's regulation. *See Motor Vehicle,* 463 U.S. at 42. The court concludes that the 108 percent rule is consistent with the ascertainable intent of Congress.

The court also concludes that the 108 percent rule is consistent with the express factors for reclassification set forth in the Medicare Act. Having concluded that the 108 percent rule is not inconsistent with the language of the Medicare Act, the court must otherwise defer to the Secretary's permissible construction of the statutory language.

The court finds the Secretary amply justified his 108 percent rule with a reasoned analysis. The Secretary explained that the rule was a result of his determination, in light of his experience and analysis of reclassifications, that the original guidelines failed to properly implement the statute. The Secretary has shown that the 108 percent threshold is rationally related to the facts found and that the rule is a logical way to limit reclassifications to hospitals significantly disadvantaged by their existing wage index. The court finds the 108 percent criterion is a reasonable mode for assessing whether or not a hospital is adequately reimbursed under the prospective payment system. Accordingly, the court concludes that the use of the 108 percent rule as a criterion for reclassification is neither arbitrary or capricious.

Based on the foregoing, IT IS HEREBY ORDERED that:

1. The Secretary's motion for summary judgment is granted.

2. St. Cloud's motion for summary judgment is denied.

LET JUDGMENT BE ENTERED ACCORDINGLY.