Dear Mr. Becker:
On behalf of the New Orleans City Park Improvement Association, you have requested an opinion of this Office regarding the question of whether City Park in New Orleans ("City Park" or "the Park") may be used for the placement of temporary travel trailers by the Federal Emergency Management Agency (FEMA) for the purpose of providing temporary housing to City residents displaced by Hurricanes Katrina and Rita. Based upon the following analysis, we opine that, under the very limited conditions outlined in your request, such a use of certain areas of City Park are valid, lawful, and do not abridge any State or federal laws.
A Brief History of City Park
City Park was originally part of the Allard Plantation. The original portion of the Park was willed by its then-owner, John McDonogh, "to the children of New Orleans." Joan B. Garvey and Mary Lou Widmer, BEAUTIFUL CRESCENT: A HISTORY OF NEW ORLEANS, 203 (Garmer Press, Inc. 1994). The City acquired some portions the park in the 1850s, but it did not have a cohesive governing board that could ensure its growth and prosperity until the 1890s. Sally K. Evans Reeves and William D. Reeves, HISTORIC CITY PARK NEW ORLEANS, 15 (Friends of City Park 1982); La. Atty. Gen. Op. No. 80-1306. Around the turn of the twentieth century, with an acreage of around 180, the Park rose to prominence as its swampy areas were drained and it became a leisure destination for the inhabitants of the growing City. Id. at 1-12. Although the Nation fell on hard times in the 1930s, City Park thrived under the Works Projects Administration. This period saw continuing expansion of the Park as well as the construction of concrete bridges and numerous sculptures. Id. at 63. The ensuing years saw the construction of Tad Gormley Stadium and the expansion of the Park to Lake Pontchartrain. Id. at 77. By the 1980s, the Park served as something of a sanctuary within the City, as a home to eighty different animal species and some 30,000 mature trees. Id. at 139. Today, the Park covers some 1500 acres, is home to the New Orleans Museum of Art, and occupies a prominent location, *Page 2 
squeezed among the Lakeview, Mid City, and Gentilly neighborhoods of New Orleans.
What is the relevance of this historical discussion? It is important to bear in mind the unique relationship that the City of New Orleans has had with City Park over the past century and a half when considering the proposed use of certain areas for temporary travel trailer placement. The fact that the Park was initially donated to the City for the "children of New Orleans" and the symbiotic relationship that has existed between the citizens and this parcel of land underscores the necessary interdependence of the two throughout their shared history and the fact that the citizens and the Park must continue to support one another in times of crisis if either are to survive.
The FEMA Lease and the Limited Use of City Park for TravelTrailer Placement
South Louisiana has, in the past year, seen perhaps more devastation wrought upon it than at any other single time in its recorded history. The 2005 tropical cyclone season brought to Louisiana the wrath of Hurricanes Katrina and Rita.[1]
These storms, especially the former, resulted, due to massive wind damage and flooding, in the displacement of countless residents of South Louisiana.[2] New Orleans has certainly seen its fair share of this devastation. Estimates place the housing affected by Katrina in the New Orleans area at 142,000 units (approximately 47% of the total affected Gulf Coast housing units of 302,000).[3] As the City attempts to rebuild, it has become essential to the City's economic viability to return its displaced citizens to the area with all due and deliberate speed. To further this goal, FEMA, in conjunction with various local entities, has made arrangements for the placement of temporary travel trailers at various locations throughout and around the City for the purpose of providing temporary living quarters for displaced residents awaiting the reconstruction of their permanent homes or the availability of other permanent housing. As part of this effort to return the City to some measure of normalcy and in a dual effort to assist in the economic viability of the City's recreational gem — City Park — FEMA and *Page 3 
the New Orleans City Park Improvement Association have entered into a lease agreement ("the Agreement") that will provide certain areas of City Park for use as temporary trailer lots.
There are two cornerstones to the Agreement that should be noted at the outset of this discussion and should be borne in mind throughout the following analysis. First, the lease contains a clear limitation on the duration of City Park's use as a location to park FEMA travel trailers: eighteen (18) months. At the end of these eighteen months, City Park must be returned, at FEMA's expense, to its original state. Second, as with many other entities in New Orleans in the wake of the 2005 tropical cyclone season, City Park is financially destitute.[4] This is due, in part, to the costs of rebuilding damage from the storms. Additionally, the Park is suffering from the decreased use, via revenue generating activities, of the Park facilities.[5]
The Agreement discussed herein would result in a substantial revenue stream (worth in excess of 2.5 million dollars), sufficient to keep the Park in operation through some of these tough times. As a related initial point, it should be noted that, on at least one previous occasion, this Office has opined that undertaking projects that are economically beneficial to City Park are consistent with the scope and charge of the City Park Improvement Association. See La. Atty. Gen. Op. No. 91-587.
The Lease Agreement[6] itself has several interesting provisions that are worthy of note herein. The Agreement covers approximately 76.55 acres of land within the Park, in the areas better known as Marconi Meadows, the Zachary Taylor site, and the South Festival site. The duration, as noted above, is "for the term of eighteen (18) months," at the rate of $223,270.83 per month.[7] Additionally, the lessor has right to approve of transfer or sublet of lease;[8] the government (lessee) shall prepare the property for the temporary trailers; no trees will be impacted in the process; and there will be no removal or damage to significant plants.[9] Most importantly, however, the subject land will be restored to its previous condition.[10] One key condition to the restoration provision is found in *Page 4 
paragraph six (6) of the FEMA Lease Rider. This provision governs the conditions under which FEMA will return the land to its prelease state. According to this provision, the removal of any improvements to the property will only be done at the request of the lessor. This means that City Park must notify FEMA of its desire to have the improvements (i.e., the works necessary to make the travel trailers habitable) removed following the termination of the lease. City Park must make this request within forty-five (45) days of the expiration of the lease. This condition must be followed in order to preserve the aesthetic integrity of the Park as well as to maintain the Park's classification within the Land and Water Conservation Fund Act, as discussed below. Finally, the lessee is to pay for all of the consequences "stemming from and/or arising out of its occupancy and use of the leased premises," save those that it is immune from.[11] This assumption of liability by the federal government includes any liability stemming from the occupants of the leased property.
Are the Trailers "Residences" as Envisioned by Act 865 of1982?
Although it would seem that the beneficial nature of the trailers, both for the temporary housing of City residents and for the economic well-being of the Park, would be enough to justify the temporary use of the Park for these purposes, the inquiry must incorporate an analysis of the law relevant to City Park.
In 1982, the Louisiana Legislature reorganized some of the law related to City Park in Act 865 of that year. Primarily, this Act brought the Park under the auspices of the Louisiana Department of Culture, Recreation, and Tourism (CRT). However, there is some language in this Act that brings the use of the Park as a location for the temporary parking of travel trailers into question.
The pertinent portion of Act 865 of 1982 is Section 1, which states that "[t]he park shall not be used for residential purposes, except for park employees."[12] The question thus arises, what is considered "residential" under the meaning of that Act? A common construction of the term "residence" reads thus:
 [p]ersonal presence at some place of abode with no present intention of definite and early removal and with purpose to remain for undetermined period . . .
Joseph R. Nolan and Jacqueline M. Nolan-Haley, BLACK'S LAW DICTIONARY, Sixth Edition, 1309 (West 1990). Under this definition, it is clear that the temporary nature of the lease at City Park undermines anyone's designs to permanently live in the Park. Because "residence" envisions living in a location for an *Page 5 
"undetermined period," it cannot be said that the eighteen-month lease between FEMA and City Park contemplates a residential scenario in the Park.
Indeed, it was more likely than not the intention of the 1982 Louisiana Legislature to avoid the encroachment of the surrounding neighborhoods into the Park than to prevent the use of the Park for the temporary placement of travel trailers in a time of emergency. This is supported by the legislative history of Act 865. The original draft of the bill that became Act 865, House Bill 1837 of the 1982 Regular Session, initially read that
 [t]he park shall not be used for any residential purposes, except that park employees may reside in facilities extant on the effective date of this Subsection
(emphasis added). This language suggests that the bill's drafter, Representative Bruneau, was concerned that the Park would become prime real estate for residential developments that would fund other Park activities and needs. Once the bill was engrossed, the emphasized language above was removed and the bill contained the exact language that passed as Act 865. There is additional information in the legislative history that lends to the theory that the language in Act 865 was intended to prevent for-profit development in the Park. In the minutes of the House Committee on Municipal, Parochial, and Cultural Affairs from June 16, 1982 ("Committee Minutes"), Representative DeWitt, speaking on behalf of Representative Bruneau, noted that one of the purposes of the bill was to "prohibit the consturction [sic] of commercial type residence[s] in the park . . ." Committee Minutes at 4. Thus, in light of the common-usage-and legislative-analyses undertaken above, it is the opinion of this Office that the temporary nature of the Agreement does not violate the prohibition against residential development in City Park. It is clear from the above analyses that temporary trailers were not the intended subject of the prohibition against residences in Act 865.
Would the Placement of Travel Trailers Constitute a Conversionof Land under the Land and Water Conservation Act?
Under the Land and Water Conservation Fund Act of 1965 ("LWCF"), property covered by that Act, in Louisiana, the entire State Park System (including City Park), must retain its general use for recreational purposes or threaten having its monetary allocations under the Act diminished or otherwise altered. 16 U.S.C. 4601-8. Thus, it is of paramount importance that any FEMA activities in City Park not run afoul of the LWCF in order to ensure the continued federal support of the entire State Park System. *Page 6 
As part of your request, you ask whether the temporary use of a portion of City Park for temporary travel trailers would constitute a conversion of the property from a recreational use to something else, thus threatening the status of City Park and perhaps other state parks in Louisiana under the LWCF. This matter has only been addressed by the courts in two reported cases. First, in Sierra Club v. Davies, 955 F.2d 1188 (C.A. 8, 1992), the Eighth Circuit considered the amount of a park that would be affected, the duration of the nonrecreational use, and the ability for the park to be restored to its original condition at the end of the use. In that case, the court found that the use of a park for the purposes of diamond mine exploration was not a conversion of the park from a recreational use. The reason for this was that the amount of land implicated was a small percentage of the park, the use was of limited duration, and the park would be returned to its original state following completion of the use.
Applying these factors to the City Park situation, it is our opinion that there is no threat of a conversion under the LWCF should temporary travel trailers be placed in the Park. First, as in Sierra Club, the amount of the park that will be used for the temporary travel trailers is small in comparison to the size of the entire Park. The land area that is proposed to be impacted by the temporary travel trailers is 76.55 acres. This is approximately 5.1% of the total land area of the Park (1500 acres). Such a small intrusion must be considered minimal, as was the use in Sierra Club. As with the use in Sierra Club, the use in City Park is agreed to be of limited duration (18 months). It is this limited duration that not only satisfies one of the components of the Sierra Club decision, but it also satisfies the requirement that the trailers not be permanently placed in City Park under Act 865 of 1982. Finally, the Agreement between City Park and FEMA requires that the Park be returned to its original condition upon the expiration of the lease. Because of this fact, the third element of Sierra Club is satisfied. Thus, under one of the two reported cases that analyze the conversion question under the LWCF, it is our opinion that the proposed use of City Park herein passes muster as not being a conversion of the Park from its recreational use.
The other case that analyzes the conversion question under the LWCF is Friends of Shawangunks, Inc. v. Clark, 754 F.2d 446
(C.A. 2, 1985). In this case, the Second Circuit found that there was a conversion of land under the LWCF when certain covered property was permanently changed in both its character and use. There is no evidence in your question that there is going to be a permanent change to the property in City Park. Indeed, the facts of this case are so distinct from the current City Park question that any further comparison is irrelevant. Because only one of the two reported cases is factually analogous to the current situation and because, under the ruling in that case the use was found not to be a conversion, it is our opinion that the proposed use of City Park to hold temporary travel trailers for Katrina and Rita victims is permissible under the *Page 7 
LWCF, as it does not convert the use of the Park to something other than recreational.
Historic Preservation Concerns
It has come to the attention of this Office that a cultural resources survey completed in contemplation of the use of these areas for the placement of the temporary travel trailers has identified some potentially significant historic structures just outside of one of the project areas. As we have noted in previous opinions, despite the emergency nature of the activities such as the placement of temporary travel trailers in City Park, such activities should not be carried out in a manner that disregards the cultural importance of a site. See La. Atty. Gen. Op. No. 05-0373.[13] Although it does not have any legal bearing on the issue of the use of City Park for the placement of the temporary travel trailers, we would entreat all parties engaged in activities at the relevant sites to be aware of these potentially significant cultural resources and to exercise all due and necessary care in the placement of the travel trailers and their attendant improvements in order that no adverse impact is wrought on the cultural integrity and significance of the Park as a result of these activities.
Summary and Conclusion
To recapitulate the salient points of our previous analysis, we offer the following opinion summary.
 1) It is the opinion of this Office that the temporary placement of travel trailers in City Park does not violate the prohibition against residences in the Park under Act 865 of 1982.
 2) The reason that Act 865 is not violated is because of the limited duration of the presence of the travel trailers in the Park (18 months) and the fact that the Park will be restored to its original state at the conclusion of the lease. *Page 8 
 3) We further opine, based on our analysis of the available case law and relevant federal statute, that the use of certain areas of the Park for temporary travel trailers does not constitute a conversion of the Park from its recreational use so as to run afoul of the Land and Water Conservation Act of 1965.
 4) To ensure strict compliance with both the spirit of Act 865 and the language of 16 U.S.C. 4601-8, the Park must be returned to its prelease state following the expiration of the lease. The City Park Improvement Association must be careful not to neglect demanding the removal of improvements within 45 days of the termination of the lease, as this will, under the Agreement, shift the burden for such removal from FEMA to City Park. This restoration is key to avoiding running afoul of the LWCF.
 5) During the installation, use, and removal of the temporary travel trailers, we caution all involved parties to be cognizant of and to actively avoid tangential damage to cultural resources in the vicinity of the project areas.
 6) It must be borne in mind that this opinion is not intended to set a precedent for future uses. By so stating, we mean that City Park should not continue to rely on this opinion in the future as a carte blanche granting of authority to erect temporary housing each time an emergency situation occurs. Because each use is fact-specific, each future use must be examined individually to determine its compliance with Act 865 and the LWCF.
Finally, although it is not legal precedent nor legally controlling in the current situation, we do find the charge contained in the original donation of the Park property to the City to be informative of this currently proposed use. That document states that the Park was donated to the City to provide for the "children of New Orleans." It seems that a plan that seeks to provide housing for displaced New Orleanians and to provide for the continued economic viability of the Park itself is indeed in keeping with this charge. The "children" of New Orleans, both young and old, are in need of assistance in these trying times. We believe that the use of City Park to provide for temporary lodging for these "children" is precisely what would have been envisioned by the donee over one hundred and fifty years ago. *Page 9 
We hope this sufficiently answers your inquiry, however if we may be of further assistance please do not hesitate to contact our office.
Sincerely yours,
 CHARLES C. FOTI, JR. ATTORNEY GENERAL
 By: __________________________ RYAN M. SEIDEMANN Assistant Attorney General
CCF, Jr./RMS/tp
[1] See generally, Ryan M. Seidemann, Louisiana Wetlands andWater Law: Recent Jurisprudence and Post-Katrina and RitaImperatives, LOYOLA L. REV. (2006).
[2] Id.
[3] These estimates are preliminary, based on data available shortly after Katrina and before Rita. National Low Income Housing Coalition (NLIHC), Hurricane Katrina's Impact on LowIncome Housing Units, NLIHC RESEARCH NOTE #05-02 (NLIHC 2005). A more recent report by FEMA, accounting for Hurricanes Katrina and Rita shows a total of 515,249 housing units damaged in Louisiana and 134,344 housing units damaged in Orleans Parish, alone. FEMA, CURRENT HOUSING UNIT DAMAGE ESTIMATES: HURRICANES KATRINA, RITA, AND WILMA, FEBRUARY 12, 2006, 11, 23 (FEMA 2006). It is hard to tell which source is more accurate, as the FEMA report does not account for unoccupied dwellings or second/summer homes and the NLIHC report is somewhat out of date. Id. at 4.
[4] Initial estimates of the costs to repair Katrina-related damages to the park hover around 43 million dollars. See, New Orleans City Park, City Park Hurricane Katrina Updates,http://www.neworleanscitypark.com/katrinastatus.php, accessed March 28, 2006. Copy on file with the Lands Natural Resources Section, Civil Division, Louisiana Department of Justice.
[5] Id.
[6] See generally, U.S. Government Lease for Real Property, Lease No. GS-07B-15965, DR-1603-LA-KATRINA. Copy on file with the Lands Natural Resources Section, Civil Division, Louisiana Department of Justice.
[7] Id. at paragraph 3.
[8] New Orleans City Park Lease Rider, paragraph 3. Document accompanying Lease, supra, note 6.
[9] Id.
[10] Id. at paragraph 6. See also, FEMA Lease Rider, Lease Number GS-07B-15965 at paragraph 6.
[11] City Park Lease Rider, supra, note 8 at paragraph 11.
[12] Although this language was passed into law in Act 865, it has never been codified in the Revised Statutes. Thus, the only source for this provision is the language of the original Act.
[13] In that opinion, we stated that,
 During the reconstruction process it is incumbent upon the local governments to ensure the protection of historic and archaeological resources for future research and education as well as to help bring tourists back to our area once we have recovered from this disaster. Despite the power of certain local governments to suspend their local historic preservation ordinances in order to "expedite" the recovery process, this does not eliminate the requirement that these entities must continue to comply with state and federal preservation laws and regulations.
La. Atty. Gen. Op. No. 05-0373. This quote underscores the importance of exercising care under emergency circumstances, a reality that prevails in this situation.